| | |
|---|---|
| ST. GEORGE HOTEL ASSOCIATES, LLC and HENRY CLARK ASSOCIATES, LLC | Civil Action No.: 1:20-cv-05097-DG-RLM |
| Plaintiffs, | |
| v. | **DEFENDANT AFFILIATED FM INSURANCE COMPANY'S SECOND NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS** |
| AFFILIATED FM INSURANCE COMPANY | |
| Defendant. | |

Defendant Affiliated FM Insurance Company ("Affiliated FM"), by its undersigned attorneys, Finazzo Cossolini O'Leary Meola & Hager, LLC, hereby submits the following supplemental authority in support of its Motion for Judgment on the Pleadings: <u>Deer Mountain Inn LLC v. Union Ins. Co.</u>, Civil Action No. 1:20-cv-0984(BKS/DJS), 2021 WL 2076218 (N.D.N.Y. May 24, 2021), and <u>Jennifer B. Nguyen v. Travelers Cas. Ins. Co. of Am.</u>, Case No. 2:20-cv-00597-BJR, 2021 WL 2184878 (W.D. Wash. May 28, 2021).

Dated: New York, New York
      June 2, 2021

**FINAZZO COSSOLINI O'LEARY**
**MEOLA & HAGER, LLC**

By: <u>*/s/ Robert F. Cossolini*</u>
    ROBERT F. COSSOLINI, ESQ.
    5 Penn Plaza, 23rd Floor
    New York, New York 10001
    (646) 378-2033
        -and-
    67 East Park Place, Suite 901
    Morristown, New Jersey 07960
    (973) 343-4960
    robert.cossolini@finazzolaw.com
    *Attorneys for Defendant*
    *Affiliated FM Insurance Company*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 2nd day of June 2021, I caused a true and complete copy of Defendant Affiliated FM Insurance Company's Second Notice of Supplemental Authority in Further Support of its Motion for Judgment on the Pleadings, to be served on all other counsel of record through the Court's electronic case filing system addressed as follows:

> **Joshua L. Mallin, Esq.**
> **Tziporah M. Pill, Esq.**
> Weg and Myers, P.C.
> Federal Plaza
> 52 Duane Street, 2nd Floor
> New York, New York 10007
> (212) 227-4210
> jmallin@wegandmyers.com
> tpill@wegandmyers.com
> *Attorneys for Plaintiffs*

*/s/ Robert F. Cossolini*
ROBERT F. COSSOLINI, ESQ.

2021 WL 2076218
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

DEER MOUNTAIN INN LLC,

Individually and on Behalf of All
Others Similarly Situated, Plaintiff,

v.

UNION INSURANCE
COMPANY, Defendant.

1:20-cv-0984 (BKS/DJS)
|
Filed 05/24/2021

**Attorneys and Law Firms**

Appearances:

For Plaintiff: James E. Cecchi, Lindsey H. Taylor, Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C., 5 Becker Farm Road, 2nd Floor, Roseland, New Jersey 07068, Christopher A. Seeger, Stephen A. Weiss, Seeger Weiss LLP, 55 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660, Samuel H. Rudman, Mark S. Reich, Robbins Geller Rudman & Dowd LLP, 58 South Service Road, Suite 200, Melville, New York 11747, Paul J. Geller, Stuart A. Davidson, Robbins Geller Rudman & Dowd LLP, 120 East Palmetto Park Road, Suite 500, Boca Raton, Florida 33432

For Defendant: Antonia B. Ianniello, Lisa M. Southerland, Steptoe & Johnson LLP, 1330 Connecticut Avenue, NW, Washington, DC 20036, Jonathan M. Bernstein, Goldberg Segalla LLP, 8 Southwoods Boulevard, Suite 300, Albany, New York 12211

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes U.S. District Judge

**I. INTRODUCTION**

**\*1** Plaintiff Deer Mountain Inn LLC, on behalf of itself and a putative multi-state class and New York sub-class of similarly situated businesses, brings this action[1] against Defendant Union Insurance Company seeking damages and declaratory relief in connection with Defendant's denial of insurance coverage for certain of Plaintiff's business losses associated with the COVID-19 pandemic. (Dkt. No. 1). Presently before the Court is Defendant's motion to dismiss Plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 20). Plaintiff has opposed Defendant's motion, (Dkt. No. 33), and Defendant has replied, (Dkt. No. 37). Both parties have also filed multiple notices of supplemental authority in support of their respective positions. (Dkt. Nos. 38, 41, 44, 47, 51, 52, 55, 57). The Court heard oral argument on the motion on May 24, 2021. For the reasons that follow, Defendant's motion is granted.

**II. FACTS[2]**

Plaintiff operates the Deer Mountain Inn, a country inn and restaurant located in Tannersville, New York. (Dkt. No. 1, ¶ 14). Like many businesses in New York and across the country, Plaintiff has been impacted by the global pandemic caused by COVID-19, a highly contagious coronavirus that was discovered in China in December 2019 and has since spread across the world, infecting millions of people in the U.S. and globally. (Id. ¶¶ 18-21). COVID-19 causes no symptoms at all in some patients, while in others it causes symptoms with a range of severity, including pneumonia, fever, cough, dyspnea, bilateral infiltrates on chest imaging, severe respiratory failure requiring ventilation and support in an intensive care unit, and death. (Id. ¶ 22). COVID-19 can be transmitted from human-to-human "through symptomatic transmission, presymptomatic transmission, or asymptomatic transmission" of infectious droplets, and can also be transmitted to humans who touch contaminated surfaces or objects. (Id. ¶¶ 23-29). COVID-19 has an incubation period of up to 14 days, during which infected people can transmit the virus regardless of whether they have any symptoms. (Id. ¶¶ 24-25).

In order to curb the spread of COVID-19 through human-to-human and surface-to-human transmission, civil authorities around the country have issued orders temporarily closing or restricting the operations of a broad range of businesses (the "Closure Orders"). (Id. ¶¶ 30-31). Plaintiff's complaint does not describe or

attach the specific closure orders that impacted its own business in New York. However, in connection with its motion, Defendant submitted copies of Executive Order No. 202.8 issued by New York Governor Andrew Cuomo on March 20, 2020 (the "New York Closure Order") with accompanying guidance published on the New York State government's website. (Dkt. Nos. 20-9, 20-10). Plaintiff has not contested the accuracy of these documents, nor has it pointed to any other specific Closure Orders that allegedly caused its losses.[3] As relevant to Plaintiff, the New York Closure Order requires "[a]ll businesses and not-for-profit entities in the state" to "reduce the in-person workforce at any work locations by 100%," but specifically exempts "[a]ny essential business or entity providing essential services or functions" from this requirement. (Dkt. No. 20-9, at 3). The guidance on the state website specifically defines "essential business" to include "restaurants [and] bars (but only for takeout/delivery)," as well as "hotels, and places of accommodation." (Dkt. No. 20-10, at 4). Thus, on its face, the New York Closure Order allowed Plaintiff's hotel business to remain open and permitted Plaintiff's restaurant business to operate take-out and delivery services at its premises, but forbade it from offering in-person dining.[4]

**\*2** At the time of the New York Closure Order, Plaintiff was insured by Policy Number CPA 5100237-16 issued by Defendant for the policy period of June 6, 2019 through June 6, 2020 (the "Policy"). (Dkt. No. 1, ¶ 17).[5] The Policy, which is a "standard form[ ] that [is] used by [Defendant] for all insureds having applicable coverage," is an " 'all-risk' commercial property polic[y] which cover[s] loss or damage to the covered premises resulting from all risks other than those expressly excluded." (*Id.* ¶¶ 32-33). Plaintiff alleges that the Policy (as well as similar policies Defendant has issued to other businesses in New York and around the country) provides coverage for business losses incurred as a result of the Closure Orders, including those issued in New York.

Plaintiff claims coverage under the Policy's business income insurance provision (the "Business Income Provision"), which provides, in relevant part:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of

your "operations" during the "period of restoration". [sic] The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

(*Id.* ¶ 35; Dkt. No. 20-2, at 136). "Business Income" is defined as the "Net Income (Net Profit or Loss before income taxes), that would have been earned or incurred" and any "[c]ontinuing normal operating expenses incurred, including payroll." (Dkt. No. 1, ¶ 36; Dkt. No. 20-2, at 136). Plaintiff also claims coverage under the Policy's extra expense insurance provision (the "Extra Expense Provision"), which provides, in relevant part:

> Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

We will pay Extra Expense (other than the expense to repair or replace property) to:

> (1) Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

> (2) Minimize the "suspension" of business if you cannot continue "operations". [sic]

> We will also pay Extra Expense to repair or replace any property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

(Dkt. No. 1, ¶ 37; Dkt. No. 20-2, at 136-37). Finally, Plaintiff claims coverage under the Policy's civil authority coverage provision (the "Civil Authority Provision"), which provides, in relevant part:

> When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits

access to the described premises, provided that both of the following apply:

(1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

**\*3** (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(Dkt. No. 1, ¶ 38; Dkt. No. 20-2, at 137).

For purposes of the foregoing provisions, "Covered Cause of Loss" is defined as "direct physical loss unless the loss is excluded or limited in this policy." (Dkt. No. 20-2, at 156). The "period of restoration" begins "72 hours after the time of direct physical loss or damage" for purposes of the Business Income Provision and "[i]mmediately after the time of direct physical loss or damage" for purposes of the Extra Expense Provision, and ends at the earlier of the "date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality" or the "date when business is resumed at a new permanent location." (Dkt. No. 20-2, at 144).

The Policy also contains an endorsement entitled "Exclusion of Loss Due to Virus or Bacteria," (the "Virus Exclusion"). The Virus Exclusion provides, in relevant part:

The exclusion ... applies to all coverage under all forms and endorsements that comprise this Coverage Part, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease ...

The terms of the [Virus Exclusion], or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part.

(Dkt. No. 1, ¶ 42; Dkt. No. 20-2, at 153). Plaintiff alleges that the Virus Exclusion is inapplicable because Plaintiff's (and the other class members') losses were not caused by COVID-19 itself, but by the Closure Orders, which were issued by civil authorities "to prevent the spread of COVID-19 in the future, not because coronavirus was found in or on Plaintiffs' [sic] insured property." (Dkt. No. 1, ¶ 43).[6]

Plaintiff alleges that Defendant "does not intend to cover losses caused by the Closure Orders as part of" the Policy, and that Defendant

has denied similar claims by other Class members across-the-board, a practice which is belied by not only the express terms of the insurance policies, but also by: (a) the Small Business Administration's requirement that "reimbursement" from "business interruption insurance" be submitted along with an application for an [Economic Injury Disaster Loan]; and (b) America's [Small Business Development Center], whose COVID-19 newsletter expressly states, "Business interruption insurance also applies if government actions cause operations to cease temporarily, which results in a loss for a firm."

**\*4** (Dkt. No. 1, ¶ 46).[7] On behalf of itself and a putative multi-state class and New York sub-class of other businesses insured by Defendant,[8] Plaintiff brings anticipatory breach of contract claims seeking damages for Defendant's denial of coverage under the Business Income Provision (Count II), the Extra Expense Provision (Count IV), and the Civil Authority Provision (Count VI). (*Id.* ¶¶ 74-83, 91-99, 107-114). Plaintiff also brings claims for declaratory relief with respect to each of those provisions (Counts I, III and V), asking this Court to issue declarations that that:

Plaintiffs' and the other Class Members' Business Income losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from those Orders are insured losses under their Policies;

[Defendant] is obligated to pay Plaintiffs and other Class Members for the full amount of the Business Income losses incurred and to be incurred in connection with the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from those Orders;

Plaintiffs' and other Class Members' Extra Expense losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from those Orders are insured losses under their Policies;

[Defendant] is obligated to pay Plaintiff and other Class Members for the full amount of the Extra Expense losses incurred and to be incurred in connection with the covered losses related to the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from those Orders;

Plaintiffs' and other Class Members' Civil Authority losses incurred in connection with the Closure Orders are insured losses under their Policies; and

[Defendant] is obligated to pay Plaintiff and other Class members the full amount of the Civil Authority losses incurred and to be incurred in connection with the covered losses related to the Closure Orders and the necessary interruption of their businesses stemming from those Orders.

(*Id.* ¶¶ 67-73, 84-90, 100-06).

## III. STANDARD OF REVIEW

 **\*5** To survive a motion to dismiss, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.' " *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.' " *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at \*2, 2017 U.S. Dist. LEXIS 155140, at \*5 (S.D.N.Y.

Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV. DISCUSSION

### A. Law Applicable to Insurance Policy Interpretation

Under New York law,[9] courts interpret insurance policies like any other contract, *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 21 N.Y.3d 324, 334 (2013), giving unambiguous provisions of a policy their "plain and ordinary meaning," *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007). Ambiguity, where found, must be resolved in favor of the insured. *In re Viking Pump, Inc.*, 27 N.Y.3d 244, 257-58 (2016). A policy is ambiguous if the language "could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.' " *Int'l Multifoods Corp. v. Commercial Union Ins.*, 309 F.3d 76, 83 (2d Cir. 2002) (quoting *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000)); *see also In re Viking Pump, Inc.*, 27 N.Y.3d at 258 ("[A] contract is not ambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.") (alteration in original) (internal quotation marks omitted).

The policyholder bears the initial burden of showing that the insurance contract covers the loss. *Roundabout Theatre Co., Inc. v. Continental Cas.*

*Co.*, 751 N.Y.S.2d 4, 7 (1st Dep't. 2002); *Morgan Stanley Grp., Inc.*, 225 F.3d at 276; *Int'l Multifoods Corp.*, 309 F.3d at 83 (describing an insured's "relatively light" burden of demonstrating coverage under an all-risk policy). "Labeling the policy as 'all-risk' does not relieve the insured of its initial burden of demonstrating a covered loss under the terms of the policy." *Roundabout,* 751 N.Y.S.2d at 7. Once an insured demonstrates that their loss is covered, the insurer has the burden of showing that an exclusion applies. *Pro's Choice Beauty Care, Inc. v. Great Northern Ins. Co.*, 140 N.Y.S.3d 544, 546 (2d Dep't 2021). If coverage is not barred by an exclusion, then the insured bears the burden of proving damages. *See Alpha Auto Brokers, Ltd. v. Continental Ins. Co.*, 728 N.Y.S.2d 769, 770 (2d Dep't 2001).

**B. Business Income and Extra Expense Coverage**

 *\*6*  Defendant argues that Plaintiff's claims under the Business Income and Extra Expense Provisions must be dismissed because Plaintiff has not plausibly alleged any "direct physical loss of or damage to property" at its premises, as required to trigger both types of coverage. (Dkt. No. 20-13, at 14-22; Dkt. No. 37-7, at 6-12; *see also* Dkt. No. 20-2, at 136-37 (providing business income coverage for business interruptions "caused by direct physical loss of or damage to property" and extra expense coverage for expenses the insured "would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss"); *id.* at 156 (defining "Covered Cause of Loss" as "direct physical loss unless the loss is excluded or limited in this policy")). Plaintiff argues that the loss it suffered here—the interruption of its business operations as a result of the Closure Orders, which deprived it of the ability to use its property for its intended purpose— is the type of "direct physical loss of ... property" contemplated by the Policy. (Dkt. No. 33, at 8-21).

In *Roundabout Theatre Co., Inc. v. Continental Cas. Co.,* 751 N.Y.S.2d 4 (1st Dep't. 2002), the New York Appellate Division construed insurance policy language materially similar to the language at issue here, and found that it did not provide coverage for losses a theater suffered when a street closure order temporarily prevented access to the theater following a nearby construction accident, which caused no physical damage to the theater. The court held:

> [T]he language in the instant policy clearly and unambiguously provides coverage only where the insured's property suffers direct physical damage. The Insuring Agreement provides coverage for "loss of, damage to, or destruction of property or facilities ... contracted by the insured for use in connection with such Production, caused by the perils insured against." The Perils Insured clause covers "all risks of direct physical loss or damage to the [insured's] property," not otherwise excluded. Reading these provisions together, the only conclusion that can be drawn is that the business interruption coverage is limited to losses involving physical damage to the insured's property ... The plain meaning of the words "direct" and "physical" narrow the scope of coverage and mandate the conclusion that losses resulting from off-site property damage do not constitute covered perils under the policy ...
>
> Other provisions in the policy support the conclusion that coverage is limited to instances where the insured's property suffered direct physical damage. In the "Definition of Loss" section of the policy, the measure of recovery is limited to "such length of time as would be required with exercise of due diligence and dispatch to *rebuild, repair or replace such part of the property herein described as has been lost, damaged or destroyed* (emphasis added)." If, as [the plaintiff] argues, the policy covers losses resulting from off-site property damage, this provision would be meaningless since the insured obviously has no duty to repair a third party's property ... An insurance policy should not be read so that some provisions are rendered meaningless (*see County of Columbia v. Continental Ins. Co.*, 83 N.Y.2d 618, 628, 634 N.Y.S.2d 345, 634 N.E.2d 946), and such would be the result if [the plaintiff's] position were upheld here.

*Id.* at 8-9.

Some years later, a federal district court in the Southern District of New York applied *Roundabout* and found that a policy providing business interruption coverage in the event of "direct physical loss or damage by

a covered peril to property" did not cover a law firm's losses that resulted when its power company preemptively shut off the firm's power as a hurricane approached in order to preserve the integrity of the power company's electrical system in the event of flooding. *Newman Myers Kreines Gross Harris, PC v. Great N. Ins. Co.*, 17 F. Supp. 3d 323 (S.D.N.Y. 2014). The court explained that, like the language at issue in *Roundabout*:

> **\*7** The critical policy language here—"direct physical loss or damage"—similarly, and unambiguously, requires some form of actual, physical damage to the insured premises to trigger loss of business income and extra expense coverage. [The plaintiff] simply cannot show any such loss or damage to the 40 Wall Street Building as a result of either (1) its inability to access its office from October 29 to November 3, 2012, or (2) [the power company's] decision to shut off the power to the Bowling Green network. The words "direct" and "physical," which modify the phrase "loss or damage," ordinarily connote actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure ... [T]he Court is unaware of authority supporting [the plaintiff's] argument that "direct physical loss or damage" should be read to include to extend to mere loss of use of a premises, where there has been no physical damage to such premises.

*Id.* at 331. In reaching this conclusion, the *Newman Myers* court considered out-of-state cases—some of which are the same as or similar to cases that Plaintiff relies on here—which found "direct physical loss or damage" where "the property at issue was rendered unusable or unsatisfactory for its intended purpose," notwithstanding that the property at issue did not suffer any actual structural alteration or damage. *Id.* at 329. The court explained the distinction between those cases and the case before it as follows:

> In each [case] there was some compromise to the physical integrity of the workplace. To be sure, the cases involving odors, noxious fumes, and water contamination did not involve tangible, structural damage to the architecture of the premises. But the critical policy term at issue, requiring "physical

loss or damage," does not require that the physical loss or damage be tangible, structural or even visible. The invasions of noxious or toxic gases in *TRAVCO* and *Essex,* rendering the premises unusable or uninhabitable, were held to suffice, because even invisible fumes can represent a form of physical damage. The contamination of well water in *Hardinger,* similarly involved physical damage, just not structural—there, to the building's water supply. Finally, the rockfall in *Murray,* although itself not having struck the premises, revealed a palpable future risk of physical damage, from another rockfall. Whether or not these cases were each correctly decided, each involved the closure of a building due to either a physical change for the worse in the premises (*TRAVCO, Essex,* or *Hardinger*) or a newly discovered risk to the its physical integrity (*Murray*). Those characteristics are not presented by [the power company's] preemptive decision to shut off power to several utility service networks in order to safeguard its own system and equipment.

*Id.* at 330.

More recently, a number of New York state and federal courts have considered claims virtually identical to Plaintiff's, involving the same policy language and similar arguments to those Plaintiff makes here. Applying the principles set forth in *Roundabout* and *Newman Myers*, these courts have uniformly found that, under New York law, the loss that Plaintiff complains of—the loss of use of property for its intended, economically beneficial purpose as a result of the Closure Orders—is not the type of "direct physical loss of ... property" the Policy contemplates. As these courts have found, this type of loss falls outside the scope of that term because it does not result from any *direct, physical* compromise to the integrity of the insured property, whether in the form of visible structural alteration or damage (as discussed in *Roundabout*) or a less tangible, but still distinctly physical, problem such as noxious gas, odor, contamination or increased risk to the property's physical integrity (as discussed in *Newman Myers*). *See, e.g., Michael Cetta, Inc. v. Admiral Indem. Co.*, No. 20-cv-4612, 2020 WL 7321405, at \*5-11, 2020 U.S. Dist. LEXIS 233419, at \*14-33 (S.D.N.Y. Dec. 11, 2020); *10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*, No. 20-cv-4471, 2020 WL 7360252, at \*2-3,

2020 U.S. Dist. LEXIS 235565, at *5-10 (S.D.N.Y. Dec. 15, 2020); *Tappo of Buffalo, LLC v. Erie Ins. Co.*, No. 20-cv-754, 2020 WL 7867553, at *3-4, 2020 U.S. Dist. LEXIS 245436, at *8-12 (W.D.N.Y. Dec. 29, 2020)[10]; *Visconti Bus Serv., LLC v. Utica Nat'l. Ins. Grp.*, No. EF005750-2020, 2021 WL 609851, at *4-10, 2021 N.Y. Misc. LEXIS 546, at *8-25 (N.Y. Sup. Ct. Feb. 12, 2021); *Soundview Cinemas Inc. v. Great Am. Ins. Grp.*, No. 605985-20, 2021 WL 561854, at *9, 2021 N.Y. Misc. LEXIS 527, at *26 (N.Y. Sup. Ct. Feb. 8, 2021); *Food for Thought Caterers Corp. v. Sentinel Ins. Co., Ltd.*, No. 20-cv-3418, 2021 WL 860345, at *3-5, 2021 U.S. Dist. LEXIS 42828, at *7-15 (S.D.N.Y. Mar. 6, 2021); *Alexandre B. Demoura, M.D., d/b/a New York Spine Inst., Inc. v. Continental Cas. Co.*, No. 20-cv-2912, 2021 WL 848840, at *4-6, 2021 U.S. Dist. LEXIS 42384, at *11-17 (E.D.N.Y. Mar. 5, 2021); *Jeffrey M. Dressel, D.D.S., P.C. v. Hartford Ins. Co. of the Midwest, Inc.*, No. 20-cv-2777, 2021 WL 1091711, at *3-5, 2021 U.S. Dist. LEXIS 54067, at *6-13 (E.D.N.Y. Mar. 22, 2021); *Sharde Harvey, DDS, PLLC v. Sentinel Ins. Co., Ltd.*, No. 20-cv-3350, 2021 WL 1034259, at *5-12, 2021 U.S. Dist. LEXIS 52552, at *11-31 (S.D.N.Y. Mar. 18, 2021)[11]; *but see Kingray Inc. v. Farmers Grp. Inc.*, No. 20-cv-9632, 2021 WL 837622, at *7-8, 2021 U.S. Dist. LEXIS 41300, at *17-21 (C.D. Cal. Mar. 4, 2021) (applying New York law and finding that "direct physical loss of or damage to property" language is ambiguous and could include a beauty salon's temporary dispossession of its property due to New York's Closure Orders, but not addressing the applicability of *Roundabout, Newman Myers*, or any of the foregoing COVID-19 cases).[12]

 **\*8** Plaintiff's claim is on all fours with the foregoing case law from state and federal courts in New York. The Policy's Business Income and Extra Expense Provisions use the precise language that courts applying New York law have consistently held unambiguously does not cover mere "loss of use" that is unconnected to any physical damage, alteration or compromise to the insured property. As the *Roundabout* court and courts following it have explained, the qualifiers "direct" and "physical" make clear that the "loss of ... property" contemplated by the Policy is restricted to losses that are *direct* and *physical* in nature, and does not include "forced closure of the premises for reasons exogenous to the premises

themselves, or the adverse business consequences that flow from such closure." *Newman Myers*, 17 F. Supp. 3d at 331.

Moreover, as in the foregoing cases, the Policy as a whole supports this interpretation. Specifically, the Policy contains a definition of "period of restoration" materially similar to the one discussed by the *Roundabout* court, (Dkt. No. 20-2, at 144), which New York courts have commonly found "suggests [that the 'direct physical loss of or damage to property' covered by the Policy refers to] the occurrence of material harm that then requires a physical fix." *Michael Cetta, Inc.*, 2020 WL 7321405, at *6, 2020 U.S. Dist. LEXIS 233419, at *19-21 (citing *Phila. Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280, 287 (S.D.N.Y. 2005)); *see also Newman Myers*, 17 F. Supp. 3d at 332 ("The words 'repair' and 'replace' contemplate physical damage to the insured premises as opposed to loss of use of it"); *Alexandre B. Demoura*, 2021 WL 848840, at *5, 2021 U.S. Dist. LEXIS 42384, at *13-14 ("Because something must first be physically damaged in order to be 'restore[d] to a sound or good condition' or 'fix[ed]' it follows from the plain language of the Policy that 'physical loss of or damage to' requires a change to the real, tangible property at issue for coverage to apply.") (alterations in original).[13] Therefore, the Court follows the persuasive analysis of virtually every New York state and federal court to consider this issue, and joins these courts in finding that the Policy's Business Income and Extra Expense Provisions do not provide coverage for Plaintiff's "loss of use" of its property resulting from the Closure Orders.

Perhaps recognizing that the policy language it relies on is not meaningfully distinguishable from the language analyzed in *Roundabout* and its progeny, Plaintiff's primary argument is that these cases were incorrectly decided (and that the Court therefore should not follow them) because they read "loss" and "damage" to have the same meaning, in violation of the "well-settled principles" that "policies should not be interpreted to make words meaningless" and that "words separated by the conjunctive 'or' are to be interpreted as separate things." (Dkt. No. 33, at 8-13). As an initial matter, this Court is "bound to apply the law as interpreted by New York's intermediate

appellate courts" unless there is "persuasive authority that the New York Court of Appeals ... would reach a different conclusion." *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir. 1999).

**\*9** Plaintiff has pointed to no such persuasive authority. Its contention that *Roundabout* and its progeny violate New York Court of Appeals law by construing "loss" and "damage" to have the same meaning is wrong. In fact, the *Roundabout* court itself addressed this very argument, and explained that its interpretation of "loss of" as excluding "loss of use" did not render any other word in the phrase "loss of, damage to, or destruction of" superfluous, because " 'loss of' could refer to the theft or misplacement of theatre property that is neither damaged nor destroyed, yet still" causes business interruption. *Roundabout*, 751 N.Y.S.2d at 8. Other courts addressing this argument in the COVID-19 context have observed that interpreting "loss of" to exclude "loss of use" does not render any word in the phrase "direct physical loss of or damage to property" superfluous, because " 'loss' would extend to the *complete* destruction of property, whereas 'damage' contemplates a lesser injury." *Michael Cetta*, 2020 WL 7321405, at \*9, 2020 U.S. Dist. LEXIS 233419, at \*27; *see also, e.g., Food for Thought*, 2021 WL 860345, at \*4, 2021 U.S. Dist. LEXIS 42828, at \*11; *Jeffrey M. Dressel*, 2021 WL 1091711, at \*4, 2021 U.S. Dist. LEXIS 54067, at \*9-10. Thus, a conclusion that the phrase "direct physical loss of ... property" unambiguously excludes the type of "loss of use" Plaintiff experienced here is entirely consistent with the insurance-policy-interpretation principles that the New York Court of Appeals has adopted and that Plaintiff relies on.

Plaintiff also points to a handful of cases from other jurisdictions in support of its claim that the phrase "direct physical loss of or damage to property" (or similar language) is at least ambiguous as to whether it includes the kind of "loss of use" Plaintiff has suffered, requiring the Court to construe the ambiguous policy in favor of the insured at the motion to dismiss stage.[14] These cases are simply inapposite; each one applied the law of a state other than New York and found that, *under the applicable state law as interpreted by that state's courts*, it was at least possible to construe the language relied on as including such "loss of

use." *See, e.g., Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 800-03 (W.D. Mo. 2020); *Cherokee Nation v. Lexington Ins. Co.*, No. 20-cv-150, 2021 WL 506271, at \*3-9 [15] (Okla. Dist. Ct. Jan. 28, 2021); *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, No. 20-cv-265, 2020 WL 7249624, at \*7-10, 2020 U.S. Dist. LEXIS 231935, at \*18-28 (E.D. Va. Dec. 9, 2020); *North State Deli, LLC v. The Cincinnati Ins. Co.*, No. 20-cv-02569, 2020 WL 6281507, at \*3-4, 2020 N.C. Super. LEXIS 38, at \*5-10 (N.C. Super. Ct. Oct. 9, 2020); *Henderson Rd. Rest. Sys., Inc. v. Zurich Am. Ins. Co.*, No. 20-cv-1239, 2021 WL 168422, at \*10-13, 2021 U.S. Dist. LEXIS 9521, at \*26-38 (N.D. Ohio Jan. 19, 2021); *Derek Scott Williams PLLC v. Cincinnati Ins. Co.*, No. 20-cv-2806, 2021 WL 767617, at \*3-5, 2021 U.S. Dist. LEXIS 37096, at \*9-14 (N.D. Ill. Fe. 28, 2021); *In re Soc'y Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, MDL No. 2964, 2021 WL 679109, at \*8-10, 2021 U.S. Dist. LEXIS 32351, at \*37-42 (N.D. Ill Feb. 22, 2021). By contrast, *New York* law since *Roundabout* has been clear and consistent in holding that, whatever ambiguity may exist in the precise meaning of the phrase "direct physical loss of or damage to property," that phrase unambiguously *cannot* refer to mere "loss of use" that is unconnected to any direct, physical compromise of Plaintiff's property.[16]

**\*10** Because the Court finds that the Policy's Business Income and Extra Expense Provisions unambiguously do not provide coverage for the losses Plaintiff complains of here, and that Defendant's denial of such coverage therefore does not constitute a breach of the Policy, Plaintiff's claims for declaratory relief (Counts I and III) and anticipatory breach of contract (Counts II and IV) under these provisions must be dismissed.

### C. Civil Authority Coverage

Defendant also argues that Plaintiff's claims under the Civil Authority Provision must be dismissed because Plaintiff has not plausibly alleged any of the "core elements" required to trigger coverage under that provision, namely that: (1) an action of a civil authority

"prohibits access" to the insured premises; (2) the action of that civil authority was issued as a result of "damage" to property not more than one mile from the insured premises caused by a Covered Cause of Loss (which, as noted previously, the Policy defines as a "direct physical loss"); and (3) the action of the civil authority was "taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or ... to enable a civil authority to have unimpeded access to the damaged property." (Dkt. No. 20-13, at 22-26; Dkt. No. 37-7, at 12; *see also* Dkt. No. 1, ¶ 38; Dkt. No. 20-2, at 137). Plaintiff does not meaningfully respond to Defendant's substantive arguments, other than to state that, "putting aside that it would be improper on a 📘 Rule 12(b)(6) motion to find as a matter of law that no business in the proximity of Plaintiff's business suffered a physical loss of or damage to their properties, if the Closure Orders caused physical loss of Plaintiff's property, they likewise caused physical loss to property in the vicinity of Plaintiff's property." (Dkt. No. 33, at 21).[17] Moreover, at oral argument, Plaintiff's counsel appeared to abandon Plaintiff's argument that its losses are covered by the Civil Authority Provision, conceding that the New York Closure Order it was subject to did not "prohibit access" to its property, as required to trigger coverage.

Plaintiff's complaint refers in general terms to "stay-at-home" and "shelter-in-place" orders issued by civil authorities nationwide that have "suspend[ed] or severely curtail[ed] business operations of non-essential businesses," including by "clos[ing] restaurants and bars for services other than take-out and delivery," and alleges that "[a]s a result of the Closure Orders ... [Plaintiff's business] had to cease operations." (Dkt. No. 1, ¶¶ 3-4, 15, 30-31, 45). But Plaintiff fails to point to any specific Closure Order that forced it to shut down its business or curtail its activities, much less allege that the relevant Closure Order met the particular requirements for coverage under the Civil Authority Provision. For this reason alone, Plaintiff's complaint falls far short of stating a claim for coverage under the Civil Authority Provision.

**\*11** Even if the Court were to consider the New York Closure Order—which is the only Closure Order the

parties discuss in their briefing or present any record evidence of—that order alone would not provide a basis for coverage under the Civil Authority Provision. By its plain terms, the New York Closure Order allowed Plaintiff's operations to remain open for hotel, take-out and delivery services, while specifically exempting those services from the capacity reduction requirements applied to businesses deemed "non-essential." As Plaintiff conceded at oral argument, under New York law, because the New York Closure Order did not completely deny access to Plaintiff's property, but merely restricted its use, it did not "prohibit access" within the meaning of the Civil Authority Provision. *See, e.g., Michael Cetta, Inc.,* 2020 WL 7321405, at \*12-13, 2020 U.S. Dist. LEXIS 233419, at \*35-39; *Food for Thought,* 2021 WL 860345, at \*6, 2021 U.S. Dist. LEXIS 42828, at \*15-17; *Sharde Harvey,* 2021 WL 1034259, at \*13-14, 2021 U.S. Dist. LEXIS 52552, at \*34-36.

Furthermore, Plaintiff's complaint speaks in generalities about the spread of COVID-19 and its impact on the business community, while failing to point to any damage to a specific property within a mile of Plaintiff's business that gave rise to the New York Closure Order. "Without specific allegations that a neighboring property suffered 'damage to property,' the Complaint fails to state a claim that is plausible on its [face] as to [Plaintiff's] entitlement to civil authority coverage." *Visconti,* 2021 WL 609851, at \*12, 2021 N.Y. Misc. LEXIS 546, at \*29 (quoting *Michael Cetta, Inc.,* 2020 WL 7321405, at \*11, 2020 U.S. Dist. LEXIS 233419, at \*35)); *Food for Thought,* 2021 WL 860345, at \*7, 2021 U.S. Dist. LEXIS 42828, at \*18 ("[G]eneralized statements [regarding widespread COVID-19 infections causing property loss and damage] cannot serve as a substitute for a specific allegation that any property near the insured's premises was in fact damaged."); *Sharde Harvey,* 2021 WL 1034259, at \*14, 2021 U.S. Dist. LEXIS 52552, at \*36-37 (finding that a complaint failed to plausibly state a claim for coverage under a civil authority provision where it did "not name any specific business 'in the immediate area' that reported a case of COVID-19, let alone one that led to the government shutdown orders").

Finally, even assuming Plaintiff had alleged (or could allege) such damage to a neighboring property, the

complaint fails to allege that the New York Closure Order was issued "in response to dangerous physical conditions resulting from the damage or continuation of" such damage, or "to enable a civil authority to have unimpeded access to the damaged property." (Dkt. No. 1, ¶ 38; Dkt. No. 20-2, at 137). To the contrary, the language of the New York Closure Order makes clear that it was issued "in order to facilitate the most timely and effective response to the COVID-19 emergency disaster" following "travel-related cases and community contact transmission of COVID-19 [that] have been documented in New York State and are expected to ... continue," not because of any damage to a specific property near Plaintiff's business. (Dkt. No. 20-9, at 2).

Such an order, issued in response to the spread of COVID-19 throughout New York State with the goal of limiting future transmission of the virus statewide, does not fall within the scope of the Civil Authority Provision under New York law. *See, e.g.,* [United Air Lines, Inc. v. Ins. Co. of State of PA, 439 F.3d 128, 134-35 & n.8 (2d Cir. 2006)](applying New York law and finding that a Washington, D.C. airport's temporary closure following the September 11, 2001 terrorist attack on the Pentagon was "caused by fears of future attacks, not by the actual physical damage inflicted on the Pentagon" and therefore did not trigger civil authority coverage); [10012 Holdings, 2020 WL 7360252, at *4, 2020 U.S. Dist. LEXIS 235565, at *11](" [T]he Complaint does not plausibly allege that the potential presence of COVID-19 in neighboring properties directly resulted in the closure of Plaintiff's properties; rather, it alleges that closure was the direct result of the risk of COVID-19 at Plaintiff's property"); [Visconti, 2021 WL 609851, at *12, 2021 N.Y. Misc. LEXIS 546, at *29-31](" [E]ven if Covid-19 contamination in other buildings were deemed to constitute direct physical loss of or damage to property, that was not the cause of any restriction imposed by civil authority upon the use of [the plaintiff's] own premises"; rather, "*both* premises are restricted for the same reason: to limit the risk of spreading the Covid-19 virus," which "simply does not implicate Civil Authority coverage"); [Food for Thought, 2021 WL 860345, at *6, 2021 U.S. Dist. LEXIS 42828, at *17-18](discussing the foregoing cases and reaching a similar conclusion); [Sharde](

[Harvey, 2021 WL 1034259, at *14, 2021 U.S. Dist. LEXIS 52552, at *37-38](same).

**\*12** Finally, even assuming Plaintiff could allege that damage to a nearby property gave rise to the New York Closure Order, Plaintiff has not plausibly alleged that such damage resulted from a Covered Cause of Loss as defined in the Policy. Obviously, "loss of use" of property that neighboring businesses suffered as a result of the New York Closure Order (or any other Closure Order) cannot itself be such a "Covered Cause of Loss"; not only would such a conclusion be nonsensical, but for the reasons explained in Section IV.B *supra*, such a loss does not constitute a "direct physical loss," and therefore cannot be a "Covered Cause of Loss" within the meaning of the Policy. And even assuming Plaintiff could plausibly allege that the New York Closure Order arose from actual COVID-19 contamination at a specific nearby property, under New York law, it is doubtful that such a contamination would constitute a "direct physical loss," and thus a "Covered Cause of Loss," under the Policy. [Visconti, 2021 WL 609851, at *12, 2021 N.Y. Misc. LEXIS 546, at *29](" [E]ven if, as [the plaintiff] alleges, buildings throughout New York have been contaminated by Covid-19, that would not constitute the 'direct physical loss of or damage to' property that is required to trigger coverage." (citing [Tappo, 2020 WL 7867553, at *4, 2020 U.S. Dist. LEXIS 245436, at *11-12](")); [Food for Thought, 2021 WL 860345, at *7, 2021 U.S. Dist. LEXIS 42828, at *19](finding that "[c]ontamination by a virus does not constitute a 'direct physical loss' that is required to trigger coverage" under a similar civil authority provision).

Because the Court finds that the Policy's Civil Authority Provision unambiguously does not provide coverage for the losses Plaintiff complains of here, and that Defendant's denial of such coverage therefore does not constitute a breach of the Policy, Plaintiff's claims for declaratory relief (Count V) and anticipatory breach of contract (Counts VI) under this provision must be dismissed.

### D. Exclusions

The parties also present arguments as to whether, assuming the losses Plaintiff complains of are insured under the Policy, coverage is nonetheless barred by the Policy's Virus Exclusion or other exclusions in

the Policy. (Dkt. No. 20-13, at 26-31; Dkt. No. 33, at 22-30; Dkt. No. 37-7, at 12-15). "These exclusions only apply if entitlement to coverage under one of the Policy's provisions is first established," and therefore, "[b]ecause the Court concludes that [Plaintiff] fails to establish entitlement to coverage under the Policy, it need not reach the question of whether these various exclusions would apply." *Michael Cetta, Inc.*, 2020 WL 7321405, at *13 n.5, 2020 U.S. Dist. LEXIS 233419, at *39 n.5; *see also, e.g., Visconti*, 2021 WL 609851, at *13, 2021 N.Y. Misc. LEXIS 546, at *34 ("Since the Court has determined that there is no coverage under the [insurance policy] in the first instance, the interpretation of the virus exclusion may await another day."); *Alexandre B. Demoura*, 2021 WL 848840, at *7, 2021 U.S. Dist. LEXIS 42384, at *19-20 ("Because Plaintiff has failed to state a claim for relief under the provisions discussed above, the question of whether the Policy contains an exclusion for losses caused by virus or pandemic is moot.").

### E. Dismissal of Plaintiff's Complaint with Prejudice

Because the Court has found that all of Plaintiff's individual claims for damages and declaratory relief must be dismissed, Plaintiff's class claims must be dismissed as well. *See, e.g.,* 🔖 *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 122 (S.D.N.Y. 2002) ("Courts in this circuit have repeatedly held that, '[i]n order to maintain a class action, Plaintiffs must first establish that they have a valid claim ... If the named plaintiffs have no cause of action in their own right, their complaint must be dismissed, even though the facts set forth in the complaint may show that others might have a valid claim.' ") (citation omitted). Therefore, Plaintiff's complaint must be dismissed in its entirety.

Plaintiff has not requested leave to amend its complaint. In any event, the Court finds that any amendment would be futile, as based on the Policy's plain language and the legal principles reviewed throughout this Decision, the Policy unambiguously does not cover Plaintiff's losses, and it does not appear that Plaintiff could plead any set of facts that would give rise to a plausible claim for the relief it seeks. Therefore, the Court dismisses Plaintiff's complaint with prejudice. *See, e.g., Michael Cetta, Inc.*, 2020 WL 7321405, at *13, 2020 U.S. Dist. LEXIS 233419, at *40 (dismissing complaint with prejudice where the plaintiff "did not move this Court for leave to amend the Complaint, and, in all events, the Court finds that allowing leave to amend would be futile"); 🔖 *10012 Holdings*, 2020 WL 7360252, at *4, 2020 U.S. Dist. LEXIS 235565, at *13 ("Leave to amend is denied because the Policy does not provide coverage for the loss Plaintiff suffered."); *Jeffrey M. Dressel*, 2021 WL 1091711, at *5, 2021 U.S. Dist. LEXIS 54067, at *15 (dismissing complaint with prejudice where "any amendment to the complaint would be futile" because "[u]nder the clear and unambiguous language of the Policy, Plaintiff cannot state a claim for relief").

### V. CONCLUSION

**\*13** For these reasons, it is hereby

**ORDERED** that Defendant's motion to dismiss Plaintiff's complaint pursuant to 🔖 Fed. R. Civ. P. 12(b)(6) (Dkt. No. 20) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's complaint (Dkt. No. 1) is **DISMISSED with prejudice** in its entirety.

**IT IS SO ORDERED.**

### All Citations

Slip Copy, 2021 WL 2076218

---

Footnotes

1    The Court has subject matter jurisdiction over this action under 🔖 28 U.S.C. § 1332(d), because at least one member of the putative class is a citizen of a different state from that of Defendant and the amount in controversy exceeds $5,000,000. (Dkt. No. 1, ¶¶ 12, 14, 16).

2    The facts are drawn from Plaintiff's Complaint, (Dkt. No. 1), as well as documents incorporated by reference in or integral to the Complaint and documents of which the Court may take judicial notice. *Velarde v. GW*

*GJ, Inc.*, 914 F.3d 779, 781 n.1 (2d Cir. 2019) (citing *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422, 429 (2d Cir. 2011)). The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

3   The Court may take judicial notice of the New York Closure Order and accompanying guidance issued by the New York Governor's office. *Nunez v. Cuomo*, No. 11-cv-3457, 2012 WL 3241260, at *16, 2012 U.S. Dist. LEXIS 110867, at *48-50 (E.D.N.Y. Aug. 7, 2012) (considering executive orders on a motion to dismiss).

4   The complaint alleges that Plaintiff's business "had to cease operations" as a result of the Closure Orders. (Dkt. No. 1 ¶ 15). The complaint does not make clear whether Plaintiff's business actually ceased operations entirely (including both its restaurant and hotel business), or whether it only stopped offering in-person dining services at its restaurant business (which is all that the plain terms of the New York Closure Order required). In Plaintiff's opposition brief, Plaintiff clarifies that its "business was limited to take-out or delivery food service," but does not mention its hotel business. (Dkt. No. 33, at 6). At oral argument, Plaintiff's counsel represented that he did not know the extent to which the New York Closure Order required Plaintiff to curtail its hotel operations. In any event, the question of whether or not Plaintiff ceased its business operations entirely for any period of time is immaterial to the Court's decision regarding insurance coverage.

5   Plaintiff did not attach a copy of the Policy to its complaint, but the complaint references and relies on the terms of the Policy throughout. (*Id.* ¶¶ 32-44, 67-114). Defendant submitted a copy of the Policy in connection with its motion, (Dkt. No. 20-2), and Plaintiff has not contested the accuracy or completeness of that copy. The Court may consider the Policy in connection with Defendant's motion, as it is incorporated by reference in and integral to Plaintiff's complaint. *Velarde*, 914 F.3d at 781 n.1.

6   The Policy contains several other exclusions which Plaintiff does not discuss in its complaint, but which Defendant contends preclude coverage. (Dkt. No. 20-13, at 30). For the reasons discussed in Section IV.D *infra*, the Court finds that it does not need to address the applicability of these exclusions.

7   Plaintiff concedes that it "did not submit a claim for its business losses because it was advised by its insurance broker that submitting a claim was a waste of time because all Closure Order-related claims were routinely being rejected by insurers." (*Id.* ¶ 44). Defendant does not contest Plaintiff's allegation that it would have denied any claim Plaintiff submitted, contend that no actual case or controversy exists under Article III of the U.S. Constitution, or otherwise seek dismissal of Plaintiff's complaint on this ground.

8   Plaintiff's proposed "Multi-State Class" is defined as:
   All entities who have entered into standard all-risk commercial property insurance policies with Union to insure property in New York, Rhode Island Connecticut, Maine, Massachusetts, New Hampshire and Vermont[,] where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities' stay-at-home or shelter-in-place orders since March 15, 2020.
   Plaintiff's proposed New York Sub-Class is defined as:
   All entities who have entered into standard all-risk commercial property insurance policies with Union to insure property in New York, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities' stay-at-home or shelter-in-place orders since March 15, 2020.
   (Dkt. No. 1, ¶ 50).

9   The parties here appear to agree that New York law applies. This shared premise is "sufficient to establish the applicable choice of law." *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001); *see also Krumme v. WestPoint Sevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (parties' assumption that New York law controls is sufficient to establish choice of law).

10   *Tappo of Buffalo* was a magistrate judge's report and recommendation which the district judge never reviewed because the case was transferred to the Western District of Pennsylvania for consolidation of pretrial proceedings pursuant to 28 U.S.C. § 1407. Conditional Transfer Order, *Tappo of Buffalo, LLC v. Erie Ins. Co.*, No. 20-cv-754 (Jan. 20, 2021), ECF No. 22.

11   *Sharde Harvey* was a magistrate judge's report and recommendation which is pending review by the district judge.

**12**     Plaintiff does not allege that its property ever actually became contaminated with COVID-19 or that it suffered any business losses as a result, and therefore the Court need not consider whether such allegations would be sufficient to plead a "direct physical loss of or damage to property" as contemplated by the Policy. The Court notes, however, that courts applying New York law to have considered the issue appear to agree that "an item or structure that merely needs to be cleaned has not suffered a 'loss' which is both 'direct' and 'physical,' " and that "[t]herefore, 'even assuming that the virus physically attached to covered property,' ... 'it did not constitute the direct, physical loss or damage required to trigger coverage because it's [sic] presence can be eliminated' by 'routine cleaning and disinfecting.' " *Tappo*, 2020 WL 7867553, at \*4, 2020 U.S. Dist. LEXIS 245436, at \*11 (citations omitted); *Visconti*, 2021 WL 609851, at \*10, 2021 N.Y. Misc. LEXIS 546, at \*25; *Food for Thought*, 2021 WL 860345, at \*5, 2021 U.S. Dist. LEXIS 42828, at \*12-14; *Jeffrey M. Dressel*, 2021 WL 1091711, at \*4, 2021 U.S. Dist. LEXIS 54067, at \*11-12; *Sharde Harvey*, 2021 WL 1034259, at \*9-11, 2021 U.S. Dist. LEXIS 52552, at \*28-29.

**13**     Plaintiff points out—correctly—that the "period of restoration" is simply a time period that "addresses the measure of the insured's losses, not whether the insured suffered 'direct physical loss or damage' in the first instance." (Dkt. No. 33, at 20-21). Plaintiff also argues that "[h]ad [Defendant] intended 'loss' to require physical alteration of the property, it should have written a definition for 'physical loss' into the policy to say that, not slipped a definition or qualification upon 'loss' through the back door in the definition of a separate term in the policy." (*Id.* at 21). Plaintiff's arguments miss the mark. The phrase "direct physical loss of or damage to property" unambiguously excludes the losses Plaintiff complains of here even without considering the "period of restoration" definition, because those losses are simply not "direct physical" losses within the ordinary meaning of that phrase. The "period of restoration" definition thus does not render an otherwise ambiguous phrase unambiguous by "slipp[ing] a definition or qualification upon 'loss' through the back door"; rather, when viewed together with the language limiting coverage to "direct physical loss of or damage to property," it merely further demonstrates that the Policy as a whole contemplates coverage only for losses that are *physical* in nature.

**14**     Notably, the cases Plaintiff points to represent a minority of COVID-19 business interruption cases that have been adjudicated across the country. Indeed, Defendant has pointed the Court to a much larger number of cases finding in the *insurer's* favor on claims involving the same or similar policy language. (Dkt. No. 20-13, at 17-22; Dkt. No. 37-7, at 8-10 & n.1-2; Dkt. No. 41). Many of these cases construe language identical to that at issue here, while others involve somewhat different policy language or are otherwise factually distinguishable. (Dkt. No. 33, at 15-20 (arguing that some of the cases Defendant relies on are distinguishable and inapposite); Dkt. No. 44, at 6-17 (same)). In any event, as with the out-of-state cases Plaintiff cites, the cases all apply the law of states other than New York, and are thus of limited value to the Court's task of applying New York law to interpret the Policy's language. Nonetheless, viewed collectively, these cases demonstrate that the Court's decision on this issue is not only firmly in line with the near-unanimous weight of New York authority, but is also consistent with the majority view expressed by courts considering the same question under other states' laws.

**15**     No parallel LEXIS citation available.

**16**     Some of the out-of-state cases Plaintiff cites are also distinguishable on other grounds. For example, in *Studio 417*, in finding that the plaintiff had suffered a direct, physical loss, the court relied heavily on allegations that COVID-19 had actually entered and contaminated the plaintiff's property. *See*  *Studio 417*, 478 F. Supp. 3d at 800-03. There are no such allegations here, and even if there were, as previously discussed, it is doubtful that such allegations would be sufficient to survive a motion to dismiss under New York law. *See* n.12 *supra*. As another example, in *Cherokee Nation*, the policy language at issue was different, and broader than, the language at issue here, as the court expressly recognized. *See Cherokee Nation*, 2021 WL 506271, at \*8.

**17**     Plaintiff devotes the remainder of the Civil Authority Provision section of its opposition brief to an argument that the cause of Plaintiff's Business Income and Extra Expenses losses was the Closure Orders, not coronavirus. (Dkt. No. 33, at 22). This argument has little relevance to the question of whether Plaintiff's losses are covered under the Civil Authority Provision; rather, it seems primarily geared toward Defendant's separate argument that the Virus Exclusion bars coverage for Plaintiff's losses.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 2184878
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington.

JENNIFER B NGUYEN,
et al., Plaintiffs,

v.

TRAVELERS CASUALTY
INSURANCE COMPANY OF
AMERICA, et al., Defendants.
WADE K MARLER
DDC, et al., Plaintiffs,

v.

ASPEN AMERICAN INSURANCE
COMPANY, Defendant.
PACIFIC ENDODONTICS
PS, et al., Plaintiffs,

v.

OHIO CASUALTY INSURANCE
COMPANY, et al., Defendants.
MARIO D CHORAK
DMD PS, et al., Plaintiffs,

v.

HARTFORD CASUALTY
INSURANCE COMPANY,
et al., Defendants.
MARK GERMACK DDS, Plaintiff,

v.

DENTISTS INSURANCE
COMPANY Defendant.
KARA MCCULLOCH DMD
MSD PLLC, et al., Plaintiffs,

v.

VALLEY FORGE INSURANCE
COMPANY, et al., Defendants.
ASPEN LODGING GROUP
LLC, et al., Plaintiffs,

v.

AFFILIATED FM INSURANCE
COMPANY, Defendant.
VITA COFFEE LLC, et al., Plaintiffs,

v.

FIREMAN'S FUND INSURANCE
COMPANY, et al., Defendants.
LA COCINA DE
OAXACA LLC, Plaintiff,

v.

TRI-STATE INSURANCE COMPANY
OF MINNESOTA, Defendant.
CARLOS O CABALLERO
DDS, MS, PS, et al.,

v.

MASSACHUSETTS BAY INSURANCE
COMPANY, et al., Defendants.

CASE NO. 2:20-cv-00597-BJR, CASE NO.
2:20-cv-00616-BJR, CASE NO. 2:20-
cv-00620-BJR, CASE NO. 2:20-cv-00627-
BJR, CASE NO. 2:20-cv-00661-BJR,
CASE NO. 2:20-cv-00809-BJR, CASE NO.
2:20-cv-01038-BJR, CASE NO. 2:20-
cv-01079-BJR, CASE NO. 2:20-cv-01176-
BJR, CASE NO. 2:20-cv-05437-BJR
|
05/28/2021

BARBARA J. ROTHSTEIN, UNITED STATES
DISTRICT JUDGE

ORDER GRANTING MOTIONS TO DISMISS

TABLE OF CONTENTS

I.
INTRODUCTION.................................................................................................................

II.
BACKGROUND.................................................................................................................

A. COVID-19....................................................................1

B. The Structure of the Policies............................................1

1. General Coverage Provisions............................................4

2. Extension Provisions...................................................5

3. Exclusion Provisions...................................................6

C. Claims Against Insurance Companies......................................6

D. Procedural History......................................................8

III. STANDARDS.............................................................10

A. Dispositive Motions....................................................10

B. Rules Governing Insurance Contract Interpretation.....................12

IV. GENERAL FINDINGS......................................................15

A. General Coverage Provisions............................................15

1. Direct Physical Loss or Damage........................................15

a. Direct Physical Damage to Property....................................16

b. Direct Physical Loss of Property......................................17

2. Washington State Precedents...........................................22

a. Perry Street and Hill and Stout.......................................22

b. Other Washington Precedents...........................................23

B. Extensions.............................................................26

1. Business Income, Extra Expense, and Extended Business Income Provisions...26

2. Civil Authority Provisions............................................26

C. Exclusions.............................................................28

1. Virus Exclusions......................................................28

a. Pandemic vs. Virus....................................................29

b. Efficient Proximate Cause.............................................29

c. Regulatory Estoppel...................................................31

D. Extra-Contractual Claims..............................................31

E. Leave to Amend........................................................33

V. INDIVIDUAL CASES.......................................................34

A. Defendant Affiliated FM Insurance Company (No. 20-cv-01038)...........34

1. Case Background........................................................34

2. Vancouver Clinic Plaintiff............................................38

a. Coverage..............................................................38

b. Recovery Limitations..................................................39

c. Extra-Contractual Claims..............................................40

3. Aspen Lodging Plaintiffs..............................................40

a. Choice of Law.........................................................41

b.

Coverage.................................................... 42
c. Extra-Contractual
Claims.......................................................................43

B. Defendant Aspen American Insurance Company
(20-cv-00616)..................................43  1. Case
Background.......................................................................43

2.
Disposition.........................................................................
a.
Coverage..............................................................................
b. Plaintiff Tabaraie's Extra-Contractual
Claims...........................................46

C. Defendant CNA Financial Corporation (20-
cv-00809)...............................................46  1. Case
Background.......................................................46

2.
Disposition.........................................................................

a.
Coverage..............................................................................

b. Business Income for Interruption of Practice
Endorsement.......................................49
c. Extra-Contractual
Claims.......................................................................51
D. Defendant Fireman's Fund Insurance Company (20-
cv-01079)..................................51

1. Case
Background..........................................................................
2.
Disposition.......................................................................53

a.
Coverage..............................................................................

b. ES Restaurant and Naccarato's Crisis
Event Business Income Provision.................54
c. Communicable Disease Coverage, Dependent
Property Coverage, and Business
Access Coverage
Extensions..................................................55

3.........................................................42      Extra-Contractual
Claims........................................................................57

E. Defendant Hanover Insurance Group, Inc. (20-
cv-05437).........................................58

1. Case
Background..........................................................................

2.
Disposition.................44

F. Defendant The Hartford Financial Services Group
(20-cv-00627)...............44.........59

1. Case
Background..........................................................................

2.
Coverage..............................................................................

3. Seattle Symphony's Virus
Exclusion.........................................................63
4. Piroshky Plaintiffs' Additional Grounds for
Coverage...................................65  a. Food
Contamination
Coverage...........................................................65
b. Dependent Property
Coverage...........................................................67

5. Extra-Contractual
Claims........................................................................68
G. Defendant Liberty Mutual Holding Company Inc.
(20-cv-00620)...............................68

1. Case
Background..........................................................................

2.
Disposition.................53
H. Defendant Dentists Insurance Company (20-
cv-00661).........................................69

1. Case
Background..........................................................................

2.
Disposition...................................................................70

I. Defendant The Travelers Companies, Inc. (20-cv-00597)...........................................71

1.                                                    Case
Background...........................................................71

2.
Disposition...................................................................71

J. Defendant Tri-State Insurance Company of Minnesota (20-cv-01176).......................72

1.                                                    Case
Background...................................................................72

2.
Disposition...................................................................72

VI.
CONCLUSION.................................................................73

## I. INTRODUCTION

Before the Court are the consolidated actions of hundreds of businesses from across Western Washington State who have turned to their insurance policies to cover lost income stemming from the COVID-19 pandemic. In response to the numerous cases being filed, and the commonality of their claims, this District assigned all such matters to the undersigned, who ordered consolidation and coordinated briefing on dispositive motions.

While the Court is sympathetic to the plight of businesses in this difficult time, today it joins the majority of those courts around the country who have addressed similar claims and finds that the businesses in question are not entitled to coverage under their insurance policies. Like the overwhelming consensus that has formed, this Court determines that COVID-19 does not cause the physical loss or damage to property required as a condition precedent to trigger coverage in all the relevant policies. As such, the Court will grant the motions for dismissal before it in accordance with the following.[1]

## II. BACKGROUND

### A. COVID-19

**\*2** COVID-19 is a viral illness that has reached pandemic proportions throughout the world.

See Covid-19, CENTERS FOR DISEASE CONTROL AND PREVENTION,

https://www.cdc.gov/coronavirus/2019-nCoV/index.html (last visited May 28, 2021).[2] In Washington State, the Governor responded to the pandemic caused by COVID-19's spread by issuing a series of Proclamations declaring a state of emergency and severely limiting, or closing, businesses, schools, and public gatherings. See Proclamations, OFFICE OF THE GOVERNOR OF WASHINGTON, https://www.governor.wa.gov/office-governor/official-actions/proclamations (last visited May 28, 2021).

All types of businesses were affected, including dentists, see Germack v. Dentists Ins. Co., No. 20-cv-00661, restaurants, see La Cocina de Oaxaca LLC v. Tri-State Ins. Co. of Minn., Compl., No. 20-cv-01176, law firms, see Owen Davies, P.S. v. Nat'l Fire Ins. Co. of Hartford, No. 20-cv-06155, barbershops, see J Bells, LLC v. Sentinel Ins. Co. Ltd., 20-cv-05820, the Symphony, see Seattle Symphony Orchestra v. Hartford Fire Ins. Co., No. 20-cv-01252, and even the Courthouse itself, see COVID-19 (Coronavirus) and Court Operations, UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON, https://www.wawd.uscourts.gov/node/614 (last visited May 28, 2021).

Impacted businesses also span the jurisdiction of the Western District of Washington. See, e.g., Mikkelson v. Aspen Am. Ins. Co., No. 20-cv-05378 (Olympia); Prato v. Sentinel Ins. Co. Ltd., No. 20-cv-05402 (Tacoma); Caballero v. Mass. Bay Ins. Co., No. 20-cv-05437 (Bremerton); Vancouver Clinic Inc. P.S. v. Affiliated FM Ins. Co., No. 20-cv-05605 (Vancouver); Canlis Inc. v. Fireman's Fund Ins. Co., 21-cv-00373 (Seattle).

In response to severe limitations on their operations, many businesses turned to their insurance policies

to recover lost wages and reduced income. This is a common story across the country as similar governmental restrictions designed to prevent the spread of the disease constricted access to every form of operation. Near uniformly, insurance companies denied the claims.

B. The Structure of the Policies
The structure of the insurance policies at issue in these cases is such that their commonalities permit the Court to address the underlying questions raised by this litigation in an inclusive ruling.

The insurance policies issued to the businesses bringing suit before this Court are of a type referred to as "all-risk" policies, in that that they insure against all risks, as compared to specific, enumerated risks.

See, e.g., 📄 C. H. Leavell & Co. v. Fireman's Fund Ins. Co., 372 F.2d 784, 787 (9th Cir. 1967) ("An 'all risks' policy creates a special type of coverage extending to risks not usually covered under other insurance, and recovery under an 'all risk' policy will be allowed for all fortuitous losses...unless the policy contains a specific provision expressly excluding the loss from coverage."); 📄 Vision One, LLC v. Phila. Indem. Ins. Co., 276 P.3d 300, 306 (Wash. 2012) (internal quotation and citation omitted) ("All-risk policies...provide coverage for all risks unless the specific risk is excluded."); see also Nature and Scope of Coverage, 10A Couch on Ins. § 148:50 (3d ed. 2020). All-risk policies, especially the ones before the Court, rely on three general types of provisions to establish what perils the policy does, and does not, cover.

1. General Coverage Provisions
 **\*3** The first is a general coverage provision, which establishes a condition precedent to trigger coverage in the first instance. In the all-risk business insurance policies before the Court, the trigger is some derivation of the term "direct physical loss of or damage to" the property covered by the policy.

For example, the insurance policy covering Dr. Carlos O. Caballero, who owns and operates Master Orthodontics in Bremerton, Washington, states that

We [i.e., the insurance company] will pay for the actual loss of Business Income you [i.e., the business] sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to a described premises shown in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations.

Caballero, Decl. of John A. Bennett, Ex. 1, No. 20-cv-05437, Dkt. No. 57 at 66[3] (Policy of Carlos O. Caballero DDS, MS, PS, "Caballero Policy") (emphasis added).

Based on this clause, the policy provides coverage for lost Business Income, which is defined and elaborated elsewhere in the policy, but only where a "direct physical loss of or damage to" the property covered by the policy has occurred.

Not all of the relevant policies use this exact construction. For example, the policy of Dr. Wade K. Marler DDS, who operates a family dentistry practice in Covington, Washington, states that "[w]e will pay for all direct physical damage to covered property at the premises described on the Declarations caused by or resulting from any covered cause of loss." Marler v. Aspen Am. Ins. Co., Decl. of Robin Wechkin, Ex. A, No. 20-cv-00616, Dkt. No. 51-1 at 8 ("Marler Policy"). The Policy defines "covered cause of loss" as "ALL RISK OF DIRECT PHYSICAL LOSS...." Id. at 25 (emphasis in original). Thus, while the Policy does not use the exact phrase "direct physical loss of or damage to," as contained in Dr. Caballero's policy, Dr. Marler's policy incorporates the same requirements of "direct" "physical" "loss" or "damage." All policies in this litigation tie coverage to direct physical loss or damage.

2. Extension Provisions
The second type of provision is an extension provision. Generally, extension provisions operate so as to either define the benefits an insured is entitled to once coverage has been triggered or to provide additional benefits beyond those covered, so long as coverage is triggered in the first instance and the requirements of the extension are met. The commonality between these two types of extensions is that they extend benefits

once the condition precedent of the general coverage provision has been fulfilled. For an example of the former, extension provisions such as Extra Expense or Extended Business Income usually appear in close proximity to a general coverage provision and define the types of losses covered in case of a covered loss, as exemplified by the following from the policy of Stan's Bar-B-Q in Issaquah, Washington:

b. Extra Expense

(1) Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

**\*4** Nguyen v. Travelers Cas. Ins. Co. of Am., Defs.' Revised Mot. to Dismiss the Consolidated Am. Class Action Compl., Ex. F., No. 20-cv-00597, Dkt. No. 53-6 at 20 ("Stan's Bar-B-Q Policy").

The latter type of extension provision provides additional criteria which must be met before its benefits are available. A common example of this type of extension is a Civil Authority provision, as exemplified by the following, also from the policy of Stan's Bar-B-Q:

G. Civil Authority

(1) When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, that are within 100 miles of the described premises, caused by or resulting from a Covered Cause of Loss.

Id. at 32.

### 3. Exclusion Provisions

The final type of relevant provisions are exclusion clauses. These provisions remove from coverage types of losses, or causes of losses, that would otherwise be triggered by a general coverage provision. In this litigation, common exclusion provisions include Virus, Consequential Loss, Ordinance or Law, and Act or Decision clauses. Of particular relevance here is the Virus exclusion, which is exemplified by the policy of Dr. Kuzi Hsue, DDS, PS, who owns and operates a dentistry practice in Tukwila, Washington:

B. We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

Nguyen, Defs.' Revised Mot. to Dismiss the Consolidated Am. Class Action Compl., Ex. D., No. 20-cv-00597, Dkt. No. 53-4 at 193 ("Hsue Policy").

### C. Claims Against Insurance Companies

Based primarily on the reasoning that COVID-19, as a virus, does not cause harm to or loss of physical property, insurance companies across the United States have denied businesses' claims for lost income pursuant to their all-risk business insurance policies. See, e.g., Vita Coffee LLC v. Fireman's Fund Ins. Co., Notice of Removal, Ex. 1, 20-cv-01079, Dkt. No. 1-1 ¶ 3.70 (Complaint of Vita Coffee LLC). Many insurance companies also denied coverage based on the exclusion clauses listed above. See, e.g., id. In response, the businesses filed suit.

The suits before this Court advance some combination of six separate causes of action. See, e.g., Owen Davies, Compl., No. 20-cv-06155, Dkt. No. 1 ¶¶ 70–91. These include (1) Declaratory Relief seeking a determination that the businesses' losses and expenses resulting from interruption of business are covered by the businesses' policies; (2) Breach of Contract based on the insurance companies' denials of coverage; (3) Insurance Bad Faith or Failure to Act in Good Faith based on the claim that the insurance companies unreasonably denied coverage or failed to reasonably investigate the businesses' claims; (4) violation of the Washington Consumer Protection Action ("WCPA"), WASH. REV. CODE § 19.86, et seq.; (5) violation of the Washington Insurance Fair Conduct Act ("IFCA"), WASH. REV. CODE § 48.30.015; and (6) Negligence. Id.

**\*5** All of the Complaints before the Court advance at least the first two foregoing causes of action, which the Court will refer to as the "Contractual Claims" as they

involve allegations related to the insurance contracts themselves. The "Extra-Contractual Claims," or the other four causes of action, generally address the propriety of the insurance companies' conduct in denying coverage. Additionally, some of the Complaints advance class action allegations seeking to represent similarly situated plaintiffs across the State and country, see, e.g., Cascadia Dental Specialists, Inc. v. Am. Fire and Cas. Co., Compl., No. 20-cv-00732, Dkt. No. 1 ¶¶ 29–39, while others include only the individually named plaintiff, see, e.g., Strelow v. Hartford Cas. Ins. Co., Compl. No. 20-cv-00797, Dkt. No. 1.

As mentioned previously, these lawsuits are prevalent across the country. The Judicial Panel on Multidistrict Litigation denied consolidation in an order dated August 12, 2020. See In re COVID-19 Bus. Interruption Prot. Ins. Litig., 482 F. Supp. 3d 1360 (J.P.M.L. 2020). The University of Pennsylvania Carey Law School's COVID Coverage Litigation Tracker ("CCLT") has been monitoring the number of similar cases filed, and their outcomes. See COVID Coverage Litigation Tracker, University of Pennsylvania Carey School of Law, https://cclt.law.upenn.edu/ (last visited May 28, 2021). As of the date of this Order, the CCLT has tracked at least 1,766 similar cases filed in federal or state court. Id. Of those cases which have published rulings on dispositive motions similar to those before this Court, the majority have granted dismissal, finding no coverage.[4]

**D. Procedural History**
The cases before the Court were transferred to the undersigned on an ad hoc, one-by-one basis as they were filed. See, e.g., Chorak, Order Reassigning Case, No. 20-cv-00627, Dkt. No. 18 (issued Sept. 9, 2020).[5] On September 29, 2020, the Court published its First Scheduling Order directing all of the parties to meet and confer to discuss the commonalities in their cases and whether consolidation was possible. See id., First Scheduling Order, Dkt. No. 21. The Court held a hearing on consolidation on November 9, 2020. Id., Min. Order, Dkt. No. 27 (setting case management conference).

Subsequently, the Court—with the cooperation of the Parties—issued a series of orders consolidating all

the matters before it to date into the ten consolidated actions currently before the Court. See id., Order on Consolidation, Dkt. No. 38. Each consolidated action represents one group of affiliated insurance companies. The ten cases are as follows:

**\*6** A. Aspen Lodging Group LLC v. Affiliated FM Ins. Co., No. 20-cv-01038 (Affiliated FM Insurance Company);

B. Marler v. Aspen Am. Ins. Co., No. 20-cv-00616 (Aspen American Insurance Company);

C. McCulloch v. Valley Forge Ins. Co., No. 20-cv-00809 (CNA Financial Corporation);

D. Vita Coffee LLC v. Fireman's Fund Ins. Co., No. 20-cv-01079 (Fireman's Fund Insurance Company);

E. Caballero v. Mass. Bay Ins. Co., No. 20-cv-05437 (The Hanover Insurance Group, Inc.);

F. Chorak v. Hartford Cas. Ins. Co., No. 20-cv-00627 (The Hartford Financial Services Group);

G. Pacific Endodontics PS v. Ohio Cas. Ins. Co., No. 20-cv-00620 (Liberty Mutual Holding Company Inc.);

H. Germack v. Dentists Ins. Co., No. 20-cv-00661 (The Dentists Insurance Company);

I. Nguyen v. Travelers Cas. Ins. Co. of Am., No. 20-cv-00597 (The Travelers Companies, Inc.); and

J. La Cocina de Oaxaca LLC v. Tri-State Ins. Co. of Minn., No. 20-cv-01176 (Tri-State Insurance Company of Minnesota).

Each Defendant insurance group filed at least one dispositive motion (either a Motion to Dismiss, Motion for Judgment on the Pleadings, or Motion for Summary Judgment) or adopted a dispositive motion already pending in a pre-consolidation case filed against them. In opposition to the dispositive motions, the Plaintiffs in seven of the ten consolidated cases chose to file the same Omnibus Response in each of their cases, jointly addressing the common issues present in all of their cases. See Chorak, Pls.' Omnibus Opp'n to Defs.' Mots. to Dismiss, No. 20-cv-00627, Dkt. No. 64 ("Omnibus Resp.").[6] The Defendants in those seven cases, in turn, filed an Omnibus Reply. See id., Defs.'

Omnibus Reply in Support of their Mots. to Dismiss and for J. on the Pleadings, Dkt. No. 73 ("Omnibus Reply").[7] The other cases which did not file the omnibus briefing followed the same timeline as the omnibus group but chose to file individual responses and replies.[8]

## III. STANDARDS

### A. Dispositive Motions

**\*7** As mentioned previously, all of the defendant insurance companies in these cases have filed at least one dispositive motion.[9] Some filed a Motion to Dismiss Pursuant to FRCP 12(b), see, e.g., Nguyen, Defs. Revised Mot. to Dismiss the Consolidated Am. Class Action Compl., No. 20-cv-00597, Dkt. No. 53; others filed a Motion for Judgment on the Pleadings pursuant to FRCP 12(c), see, e.g., Pacific Endodontics, Defs.' Mot. for J. on the Pleadings, No. 20-cv-00620, Dkt. No. 46; and others still filed a Motion for Summary Judgment pursuant to FRCP 56, see, e.g., Germack, Defs.' Mot. for Summ. J., No. 20-cv-0061, Dkt. No. 35.

All three types of motions test the legal sufficiency of a plaintiff's claims. Under FRCP 12(b), a complaint should be dismissed where the plaintiff "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Similarly, pursuant to FRCP 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings," which is assessed under the same standard as FRCP 12(b). FED. R. CIV. P. 12(c); see also Gregg v. Haw. Dep't of Pub. Safety, 870 F.3d 883, 887 (9th Cir. 2017) (quoting Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) ("Because a Rule 12(c) motion is 'functionally identical' to a Rule 12(b)(6) motion, 'the same standard of review applies to motions brought under either rule.' "). Summary Judgment pursuant to FRCP 56 holds that a motion should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

In a motion to dismiss and motion on the pleadings, the Court must "accept the allegations in [the] complaint as true and construe the pleadings in the light most favorable to [the plaintiff]." Young v. State, 992 F.3d 765, 778 (9th Cir. 2021); Fleming v. Pickard, 581 F.3d 922, 925 (9th Cir. 2009). In doing so, the Court is limited to reviewing materials that are submitted with, and attached to, the complaint; matters appropriate for judicial notice; and unattached evidence on which the complaint "necessarily relies." Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross & Blue Shield of Ill., 983 F.3d 435, 439 (9th Cir. 2020). During a motion for summary judgment, the Court "view[s] justifiable inferences in the light most favorable to the nonmoving party" but, at the same time, "the nonmoving party 'may not rest upon mere allegations or denials of its pleading.' " Momox-Caselis v. Donohue, 987 F.3d 835, 841 (9th Cir. 2021) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

Most of the cases currently before the Court have not conducted discovery. The Court stayed all discovery at the request of the Parties in most of the cases pending consideration of the dispositive motions. See, e.g., Chorak, Scheduling Order, No. 20-cv-00627, Dkt. No. 39 at 1.[10]Based on the lack of discovery, and the fact that the Court directed the Parties to address largely issues of law in their dispositive motions concerning coverage and exclusions, the Court will evaluate all of the Motions according to the FRCP 12(b) and 12(c) standard and consider only the evidence appropriate to those types of motions.

**\*8** B. Rules Governing Insurance Contract Interpretation Determining whether the insurance policies at issue cover the type of losses claimed by the

Plaintiffs requires the Court to interpret the terms of the relevant insurance policies.

Federal Courts sitting pursuant to diversity jurisdiction, as here, apply state substantive law, including the state substantive law regarding insurance policy interpretation. See Indian Harbor Ins. Co. v. City of Tacoma Dep't of Pub. Utilities, 354 F. Supp. 3d

1204, 1212 (W.D. Wash. 2018) (citing Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 427 (1996)). Under Washington law, "[c]onstruction of an insurance policy is a question of law for the courts, the policy is construed as a whole, and the policy should be given a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." Queen Anne Park Homeowners Ass'n v. State Farm Fire & Cas. Co., 352 P.3d 790, 792 (Wash. 2015) (quoting Queen City Farms, Inc. v. Cent. Nat. Ins. Co. of Omaha, 882 P.2d 703, 712 (Wash. 1994)).

"In construing the language of an insurance policy," the Court looks to "the entire contract, [which] must be construed together so as to give force and effect to each clause." Boeing Co. v. Aetna Cas. & Sur. Co., 784 P.2d 507, 511 (Wash. 1990). Undefined terms within a policy are to be given their "plain, ordinary, and popular meaning." Xia v. ProBuilders Specialty Ins. Co., 400 P.3d 1234, 1240 (Wash. 2017) (quoting Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co., 881 P.2d 201, 207 (Wash. 1994)). In determining this meaning, the Court may reference standard English language dictionaries. Kut Suen Lui v. Essex Ins. Co., 375 P.3d 596, 601 (Wash. 2016); see also Feenix Parkside LLC v. Berkley N. Pac., 438 P.3d 597, 603 (Wash. Ct. App. 2019).

If an undefined term is ambiguous, it "must be construed against the insurer and in favor of the insured." Holden v. Farmers Ins. Co. of Wash., 239 P.3d 344, 347 (Wash. 2010). A term is considered to be ambiguous where "it is susceptible to more than one reasonable interpretation." Id.; see also McLaughlin v. Travelers Com. Ins. Co., 476 P.3d 1032, 1037 (Wash. 2020). In determining whether ambiguity exists, the Court may look to "context and the intent of parties." Holden, 239 P.3d at 347. Where, however, the language of a policy is clear and unambiguous, the Court "must enforce the policy as it is written and may not modify the policy or create ambiguity where none exists." Mass. Bay Ins. Co. v. Walflor Indus., Inc., 383 F. Supp. 3d 1148, 1157 (W.D. Wash. 2019) (citing Pub. Util. Dist. No. 1 of Klickitat Cnty. v. Int'l Ins. Co., 881 P.2d 1020, 1025 (Wash. 1994)).[11]

**\*9** Determining whether coverage exists is a two-step process. See Overton v. Consol. Ins. Co., 38 P.3d 322, 329 (Wash. 2002); see also Black v. Nat'l Merit Ins. Co., 226 P.3d 175, 178 (Wash. Ct. App. 2010). "The burden first falls on the insured to show its loss is within the scope of the policy's insured losses. If such a showing has been made, the insurer can nevertheless avoid liability by showing the loss is excluded by specific policy language." Overton, 38 P.3d at 329 (citing McDonald v. State Farm Fire & Cas. Co., 837 P.2d 1000, 1003–04 (Wash. 1992)). In other words, in the two-step process the Court looks to see if there is coverage under a general coverage provision and then turns to whether an exclusion subsequently removes coverage. In the latter step, exclusionary clauses are "strictly construed against the insurer." Webb v. USAA Cas. Ins. Co., 457 P.3d 1258, 1266 (Wash. Ct. App. 2020).

## IV. GENERAL FINDINGS

The Court divides the remainder of this Order into two sections. The first will examine applicable questions of coverage and exclusions based on the common terms contained in all the insurance policies at issue. The Court will then proceed to apply its general findings to the specific cases at issue, addressing any unique aspects of those cases.

### A. General Coverage Provisions

#### 1. Direct Physical Loss or Damage

As noted above, all the insurance policies at issue require some form of the phrase "direct physical loss of or damage to" covered property to trigger coverage in the first instance. No Washington State appellate court has addressed whether COVID-19, in concert with the Governor's Proclamations, causes direct physical loss or damage. Two Washington trial courts have examined this question and determined that the term is at least ambiguous as to COVID-19-related losses, and, thus, coverage applies. See Perry Street Brewing Co. v. Mut. of Enumclaw Ins. Co., No. 20-2-02212-32, 2020 WL 7258116 (Wash. Super. Ct. Nov. 23, 2020); Hill and Stout PLLC v. Mut. of Enumclaw Ins. Co., No.

20-2-07925-1 SEA, 2020 WL 6784271, at *1 (Wash. Super. Ct. Nov. 13, 2020).

Plaintiffs urge the Court to follow these two state court decisions and find that the term is ambiguous and, therefore, coverage exists. Omnibus Resp. at 1; see also id. at 11–27. In doing so, Plaintiffs rely heavily on the courts' opinions in Perry Street and Hill and Stout. See id. at 20–22.

Defendants, on the other hand, argue the requirement for direct physical loss or damage is clear, unambiguous, and does not provide coverage for COVID-19-related losses. See Omnibus Reply at 7–23. They further argue that Washington appellate precedent aligns with this interpretation, id. at 8–15, and that Perry Street and Hill and Stout were wrongly decided, id. at 15–16. Therefore, Defendants urge the Court to follow the now overwhelming majority of courts who have found no coverage. Id. at 17–21.

None of the policies at issue formally defines "direct physical loss of or damage to." Most, if not all, courts that have examined this phrase have recognized that the disjunction between "loss of" and "damage to" leads to the conclusions that (1) the terms "loss" and "damage" must mean something different, giving both distinct meaning, see, e.g., Frank Van's Auto Tag, LLC v. Selective Ins. Co. of the Se., No. 20-cv-2740, 2021 WL 289547, at *4 (E.D. Pa. Jan. 28, 2021); and (2) that the "direct physical" modifies both "loss" and "damage," see, e.g., Plan Check Downtown III, LLC v. AmGuard Ins. Co., 485 F. Supp. 3d 1225, 1229 (C.D. Cal. 2020). Thus, this Court must determine the meaning of the term "direct physical loss of" as well as the term "direct physical damage to" the insured property.

### a. Direct Physical Damage to Property

 **\*10**  The Court begins with "damage" as it is more straightforward. Most of the Plaintiffs before this Court seem to concede that COVID-19, as an airborne virus that can live only briefly on non-organic surfaces, does not cause damage to those surfaces, such as the buildings, counters, dentist chairs, and other insured property of the businesses at issue. See, e.g., Omnibus Resp. at 11–16 (focusing on arguments that COVID-19 causes "loss of" insured property). Some Plaintiffs, however, have argued that COVID-19

causes "damage to" covered property as "[a]n average purchaser of insurance...would understand that the physical presence of COVID-19 causes 'loss' and/or 'damage' because it contaminates and thereby alters physical surfaces in a way that creates a risk of serious illness and death for patients and staff." Aspen Lodging, Pl. the Vancouver Clinic's Mot. for Partial Summ. J. against Def. Affiliated FM Ins. Co., No. 20-cv-0138, Dkt. No. 33 at 18–19.

The Court rejects this interpretation of direct physical damage. As numerous courts have recognized, "COVID-19 hurts people, not property," Johnson v. Hartford Fin. Servs. Grp., Inc., No. 20-cv-02000, 2021 WL 37573, at *7 (N.D. Ga. Jan. 4, 2021), as "the pandemic impacts human health and human behavior, not physical structures," Uncork & Create LLC v. Cincinnati Ins. Co., 498 F. Supp. 878, 884 (S.D.W. Va. 2020); see also, e.g., Select Hosp., LLC v. Strathmore Ins. Co., No. 20-cv-11414, 2021 WL 1293407, at *3 (D. Mass. Apr. 7, 2021); Wellness Eatery La Jolla LLC v. Hanover Ins. Grp., No. 20-cv-1277, 2021 WL 389215, at *7 (S.D. Cal. Feb. 3, 2021). Thus, all that is needed to decontaminate is to "wipe[ ] [the virus] off the surface with disinfectant," attesting to the fact that there is no underlying damage. Woolworth LLC v. The Cincinnati Ins. Co., No. 20-cv-01084, 2021 WL 1424356, at *4 (N.D. Ala. Apr. 15, 2021); see also, e.g., Town Kitchen LLC v. Certain Underwriters at Lloyd's, London, No. 20-cv-22832, 2021 WL 768273, at *7 (S.D. Fla. Feb. 26, 2021) (relying on Mama Jo's Inc. v. Sparta Ins. Co., 823 F. App'x 868 (11th Cir. 2020)). The Court concludes that COVID-19 does not cause direct physical damage to property as the term is used in the insurance policies.

### b. Direct Physical Loss of Property

The Parties debate whether COVID-19 causes direct physical loss of property at greater length. The key term in this context is "loss." Defendants argue that "loss" means that the property incurred an "actual and discernable physical alteration" or that the insured has been "permanent[ly] and physical[ly] dispossess[ed]" of the property, such as through theft or total destruction. Omnibus Reply at 8. Plaintiffs counter that "loss" means not only a physical alteration

of the insured property, but it also includes "the loss of the ability to use property." Omnibus Resp. at 11.

In determining the meaning of "loss" as used in these insurance policies, the Court turns to its common definition. "Loss" is defined as "the act or fact of being unable to keep or maintain something" or "the act of losing possession" of something. Loss, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/loss (last visited May 28, 2021). "Possess," in turn, is commonly defined as "to have and hold as property," similar to "own," or to "seize and take control of." Possess, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/possess (last visited May 28, 2021). Thus, "loss of" is best understood as no longer being able to own or control the property in question. When combined with "direct" and "physical" the Court determines that, in its common usage, "loss" means that the alleged peril must set in motion events which cause the inability to physically own or manipulate the property, such as theft or total destruction.

This reasoning aligns with most of the federal courts who have confronted this question and held that "physical loss of" requires tangible, material, discernable, or corporeal dispossession of the covered property, which COVID-19 does not cause. To be certain, the terminology courts have used varies. For example, most California courts have adopted the phrase "distinct, demonstrable, physical alteration," see, e.g., Island Rests., LP v. Affiliated FM Ins. Co., 20-cv-02013, [image] 2021 WL 1238872, at *3 (S.D. Cal. Apr. 2, 2021); [image] O'Brien Sales & Mktg., Inc. v. Transp. Ins. Co., No. 20-cv-02951, 2021 WL 105772, at *3 (N.D. Cal. Jan. 12, 2021); 10E, LLC v. Travelers Indem. Co. of Conn., 483 F. Supp. 3d 828, 836 (C.D. Cal. 2020), which derives from the California Court of Appeals' decision in [image] MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co., 115 Cal. Rptr. 3d 27, 37 (Cal. Ct. App. 2010). While that definition derives from a California court applying California law, there is nothing that limits this understanding to California law, as the phrase is popular outside of that State in courts applying the law of their home states.[12] MRI Healthcare itself took the phrase from a treatise on insurance

law, attesting to its wider applicability. See [image] MRI Healthcare Ctr., 115 Cal. Rptr. 3d at 37 (quoting Generally; "Physical" loss or damage, 10A Couch on Ins. § 148:46 (3d ed. 2020)). Other phrases are commonly used by courts, including "tangible alteration,"[13] "material, perceptible destruction or deprivation of possession,"[14] "physical manifestation of loss or damage,"[15] and "physically impact[ed]."[16]

**\*11** Also common is an understanding of what direct physical loss does not cover, including "purely economic losses." See, e.g., [image] Equity Plan. Corp. v. Westfield Ins. Co., No. 20-cv-01204, 2021 WL 766802, at *10 (N.D. Ohio Feb. 26, 2021); [image] Rococo Steak, LLC v. Aspen Specialty Ins. Co., No. 20-cv-2481, 2021 WL 268478, at *5 (M.D. Fla. Jan. 27, 2021); Tappo of Buffalo, LLC v. Erie Ins. Co., No. 20-cv-754, 2020 WL 7867553, at *4 (W.D.N.Y. Dec. 29, 2020). This Court finds that, in arguing that direct physical loss covers loss of income in these circumstances, Plaintiffs conflate physical loss with non-physical loss of use. Detrimental economic impact, however, does not trigger coverage under the property insurance here at issue. As numerous courts have held, "economic business impairments caused by COVID-19 safety orders do not fall within the scope of coverage." [image] Caribe Rest. & Nightclub, Inc. v. Topa Ins. Co., No. 20-cv-03570, 2021 WL 1338439, at *3 (C.D. Cal. Apr. 9, 2021) (emphasis in original) (citing 10E, 483 F. Supp. 3d at 836); see, e.g., Cafe Int'l Holding Co. LLC, v. Westchester Surplus Lines Ins. Co., No. 20-cv-21641, 2021 WL 1803805, at *1 (S.D. Fla. May 4, 2021) ("Plaintiff may have lost business because of the pandemic, but a decline in restaurant revenue or profits is merely an economic loss, not a loss covered by the policy."); see also id. at *8.

Terminology aside, the result is the same. In order to trigger coverage under a direct physical loss theory, an outside peril must cause an inability to interact with the property because of an alteration to its physical status. COVID-19, and more specifically the Governor's Proclamations, may have limited the uses of the property by preventing certain indoor activities previously conducted on the premises, but they did not cause dispossession of the buildings, chairs, dental tools, etc. As other courts have adeptly summarized,

the "property did not change. The world around it did." Town Kitchen, 2021 WL 768273, at *5.

Interpreting direct physical loss to include only tangible dispossession aligns with insurance law doctrine which holds that all-risk contracts are intended to cover damage to property, not economic loss. As a commonly cited treatise states,

> The requirement that the loss be "physical," given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

Generally; "Physical" loss or damage, 10A Couch on Ins. § 148:46 (3d ed. 2020) (footnotes omitted).

Numerous federal courts have followed Couch in finding that damages resulting from COVID-19 are not covered by the policies at issue in these COVID cases.[17] In other words, "Plaintiff[s'] operations are not what is insured—the building and the personal property in or on the building are." Real Hosp., LLC v. Travelers Cas. Ins. Co. of Am., 499 F. Supp. 3d 288 (S.D. Miss. 2020).

Several Plaintiffs seek to distinguish their cases from this conclusion by asserting the actual presence of COVID-19 on their premises, e.g., by visitation from an infected person, rather than merely the threat of exposure. Given the Court's conclusion that COVID-19 does not cause physical harm or damage to non-organic surfaces, the Court finds that the pleading of actual presence is immaterial.[18]

**\*12** This Court joins the numerous courts across the country that have held that COVID-19 does not trigger direct physical loss or damage.

## 2. Washington State Precedents

The Court turns to Washington precedent and finds that it is consistent with the conclusion that COVID-19 does not cause direct physical loss of or damage to covered property. The Washington State Supreme Court has not yet addressed the question of whether

COVID-19 causes direct physical loss or damage. Therefore, this Court's task is to predict how it would. "Where the state's highest court has not squarely addressed an issue, [the Court] 'predict[s] how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.'" Judd v. Weinstein, 967 F.3d 952, 955–56 (9th Cir. 2020) (quoting Lewis v. Tel. Emps. Credit Union, 87 F.3d 1537, 1545 (9th Cir. 1996)); see also Childress v. Costco Wholesale Corp., 978 F.3d 664, 665 (9th Cir. 2020) ("If the state's highest appellate court has not decided the question presented, then [the Court] must predict how the state's highest court would decide the question.").

### a. Perry Street and Hill and Stout

Both Parties agree, as they must, that Washington trial court decisions are not binding on this Court. Bauman v. Turpen, 160 P.3d 1050, 1055 (Wash. Ct. App. 2007) ("the findings of fact and conclusions of law of a superior court are not legal authority and have no precedential value."). Plaintiffs, nevertheless, point to the two Washington trial court decisions in Perry Street and Hill and Stout, which concluded that the meaning of "direct physical loss of or damage to" covered property is ambiguous and, thus, must be construed in Plaintiffs' favor.

The court in Perry Street stressed that "loss" and "damage" must be interpreted to have distinct meanings and loss could be understood to cover situations where "property could not physically be used for its intended purpose." Perry Street, 2020 WL 7258116, at *3. Similarly, Hill and Stout held that the plaintiffs had been deprived of their dental practice when they were unable to see patients. Hill and Stout, 2020 WL 6784271, at *2.

The Court finds this reasoning unpersuasive. The reasoning that "loss" could plausibly mean something akin to "deprivation of use" discounts the preceding term "physical." As stated above, this Court has already determined—in accord with the reasoning of the vast majority of those courts that have addressed the issue—that COVID-19 does not physically alter

the insured property. The only change is an intangible restriction of what the property may be used for.

Thus, this Court declines to follow the conclusions reached in Perry Street and Hill and Stout.

### b. Other Washington Precedents

In supporting their arguments that COVID-19-related losses do not trigger direct physical loss or damage to covered property, Defendants rely heavily on at least three Washington State appellate court cases for the position that Washington law requires discernable physical alteration or permanent dispossession of property, including Villella v. Public Employees Mutual Insurance Company, 725 P.2d 957 (Wash. 1986); Fujii v. State Farm Fire & Casualty Company, 857 P.2d 1051 (Wash. Ct. App. 1993); and Wolstein v. Yorkshire Insurance Company, Ltd., 985 P.2d 400 (Wash. Ct. App. 1999). See Chorak, Defs. Hartford Cas. Ins. Co., Hartford Fire Ins. Co., and Sentinel Ins. Co., Ltd.'s Mot. to Dismiss and Mot. for J. on the Pleadings, No. 20-cv-00627, Dkt. No. 56 at 8–11; Omnibus Reply at 8–15.[19]

**\*13** Examining these cases, two conclusions are clear to this Court. First, none is directly on-point as they do not address the specific type of losses COVID-19 causes. Thus, they do not dictate this Court's decision in the present circumstances. At the same time, all three interpret the phrase "direct physical loss of or damage to," or the similar phrase "physical loss to," in a way that emphasizes the physicality of loss, or the requirement of a physical consequence, which supports this Court's conclusion that "physical loss" means dispossession and loss of tangible control, rather than mere loss of use.

The Court finds Fujii and Wolstein illustrative. See Fast Trak Inv. Co. v. Sax, 962 F.3d 455, 465 (9th Cir. 2020) (internal quotations and citations removed) ("An intermediate state appellate court decision is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.").

In Fujii, the Washington Court of Appeals examined the case of a married couple whose home was threatened by the prospect of a landslide after heavy rainfall caused soil destabilization upslope. Fujii, 857 P.2d at 1051. The court held that, since no damage had yet occurred, there was no coverage pursuant to a policy which required "direct physical loss to the property." Id. at 1052–53 ("it is undisputed that there was no discernible physical damage to the dwelling during the effective period of the policy.").

Similarly, in Wolstein, the Washington Court of Appeals addressed a vessel owner who sought to recover pursuant to a policy covering "all risks of physical loss of or damage to the Vessel." Wolstein, 985 P.2d at 407; see id. at 403–04. In that case, the original shipbuilder abandoned construction of the insured yacht after running into financial difficulties and declaring bankruptcy. The court held that the physical loss or damage provision did not cover the alleged losses because the shipbuilder's "financial difficulties, while prolonging completion of the [yacht] and increasing the costs of her completion, did not inflict physical damage to the [yacht] or result in the physical loss of the yacht." Id. at 407.

Plaintiff's attempts to distinguish these cases are unconvincing. See Omnibus Resp. at 22–25. In doing so, they rely heavily on the factual dissimilarities between the circumstances in these cases and the one here. It is already clear, however, that no Washington appellate court has confronted this specific circumstance in relation to this specific term. The Court's charge in this circumstance is not merely to determine whether there is a factually analogous case on-point. Instead, the Court is tasked with predicting how the Washington Supreme Court would rule based on the line of precedent before it. To this end, the Court finds that these precedents are useful indicators that the Washington Supreme Court would decide that the term "physical loss" requires dispossession of property.

### B. Extensions

Almost all Plaintiffs argue that, should the Court find that the general coverage provisions do not afford them coverage in the COVID-19 situation, the Court should

look to the extension provisions contained in their insurance contracts for independent coverage grounds. Plaintiffs contend the following provisions provide coverage.

## 1. Business Income, Extra Expense, and Extended Business Income Provisions

None of the extension provisions which define the benefits an insured is entitled offer coverage as they rely on an initial trigger of the general coverage provision discussed above. Often, these extension provisions themselves explicitly incorporate the requirement for physical loss or damage. For example, the provisions found in the policy of Stan's Bar-B-Q, quoted in the footnote below, do not act as independent grounds for finding coverage for these reasons. See Stan's Bar-B-Q Policy at 19–20.[20]

## 2. Civil Authority Provisions

 **\*14**  Plaintiffs contend that the Civil Authority provisions found in their policies entitle them to coverage, either as an extension of the general coverage provision or independently. See Omnibus Resp. at 28–44.

As exemplified by the policy of Stan's Bar-B-Q reproduced supra, and here in footnote, the Civil Authority provisions only extend benefits covering actual loss of "Business Income" and "reasonable and necessary Extra Expenses" where its terms are met. See Stan's Bar-B-Q Policy at 32.[21] Those terms include that (1) coverage is triggered in the first instance ("[w]hen the Declarations show that you have coverage for Business Income and Extra Expense"); (2) the extended losses are caused by the "action of civil authority"; (3) that "prohibits access to the described premises"; and (4) the cause of the civil authority itself must stem from "direct physical loss of or damage to property" other than the business's property within a geographic radius (100 miles in Stan's Bar-B-Q's case), which, in turn, must be caused by a Covered Cause of Loss. Id. The archetypal civil authorities that trigger coverage under such a provision are ordinances regulating construction, repair, or right to use property (including destruction of the property), such as evacuation orders during a natural disaster.

See Nature of Provision, Generally, 10A Couch on Ins. § 152:22 (3d ed. 2020); John DiMugno, The Implications of COVID-19 for the Insurance Industry and its Customers: 2021 Developments, 43 No. 3 Insurance Litigation Reporter NL 1 (Mar. 12, 2021).

The Court finds that the Civil Authority provisions do not provide coverage in these circumstances. First, where the Civil Authority provision is premised on an initial trigger of coverage, there are no independent grounds to find coverage as the Court has found no trigger because COVID-19 does not cause direct physical loss of or damage to insured property. Second, where the Civil Authority provision incorporates the requirement for physical loss or damage to a neighboring building, there is no coverage because the Court has already found COVID-19 does not cause such loss or damage. As demonstrated below, these two deficiencies defeat coverage under every permutation of the Civil Authority provision in these cases. This view has prevailed among federal courts examining whether similar Civil Authority provisions provide coverage as a result of COVID-19. See, e.g., Aggie Invs., LLC v. Cont'l Cas. Co., 21-cv-0013, 2021 WL 1550479, at \*5 (E.D. Tex. Apr. 20, 2021); Mohawk Gaming Enters., LLC v. Affiliated FM Ins. Co., No. 20-cv-701, 2021 WL 1419782, at \*3–\*6 (N.D.N.Y. Apr. 15, 2021); Select Hosp., 2021 WL 1293407, at \*4 (D. Mass. Apr. 7, 2021).

## C. Exclusions

 **\*15**  While the Court's decision that the term "physical loss or damage" does not provide coverage in the case of COVID-19 is determinative, the Parties expend extensive time contesting the applicability of the Virus exclusion contained in many of their policies. In the interest of completeness, the Court will address this issue.

## 1. Virus Exclusions

Plaintiffs argue that the Virus exclusions do not bar coverage. See Omnibus Resp. at 55– 65. The Virus exclusions state that "[w]e will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease," or something similar. Hsue Policy at 193.

a. Pandemic vs. Virus

Plaintiffs first argue that the Virus exclusion is not applicable because their losses stem from a pandemic, not a virus, and, thus, the provision is not triggered in the first instance. Omnibus Resp. at 56–58.

It is difficult to see how a pandemic differs from a virus other than in scope. Quite simply, one causes the other. See Pandemic, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/pandemic (last visited May 28, 2021) ("an outbreak of a disease that occurs over a wide geographic area (such as multiple countries or continents) and typically affects a significant proportion of the population"). The average insured would not be surprised to learn that a Virus exclusion excludes coverage based on measures taken to prevent a pandemic caused by a virus.

b. Efficient Proximate Cause

Plaintiffs' invocation of Washington's Efficient Proximate Cause Rule does not change this conclusion. In the exclusion context, as the provision at issue here is the Virus exclusion, the Rule holds that if "an excluded occurrence initiates the causal chain and is itself either the sole proximate cause or the efficient proximate cause of the loss," there is no coverage. Xia, 400 P.3d at 1241; see also, e.g., Boxed Foods Co. v. Cal. Cap. Ins. Co., 497 F. Supp. 3d 516, 522 (N.D. Cal. 2020) (internal citations and quotations removed) ("An efficient proximate cause is a cause of loss that predominates and sets the other cause of loss in motion. When loss can be attributed to two causes —a covered and an excluded cause—coverage only exists if the efficient proximate cause of the damage is covered under the policy.").

In this case, the dispute comes down to whether COVID-19 or the Governor's Proclamations predominately caused the businesses' losses. See Omnibus Resp. at 58–62. If the virus was the efficient proximate cause of the losses, the Virus exclusion would apply, barring coverage. If, as Plaintiffs argue, the Proclamations were the true efficient proximate cause of the business losses, the exclusion would not apply (so the argument goes) because the Proclamations are not an excluded cause under the

Virus exclusions. See, e.g., Causeway Auto., LLC v. Zurich Am. Ins. Co., No. 20-cv-8393, 2021 WL 486917, at *5–*6 (D.N.J. Feb. 10, 2021).

Determination of the efficient proximate cause is ordinarily a task for the jury but, "when the facts are undisputed and the inferences therefrom are plain and incapable of reasonable doubt or difference of opinion," then determination of efficient proximate cause is a question of law for the Court. Graham v. Pub. Emps. Mut. Ins. Co., 656 P.2d 1077, 1081 (Wash. 1983).

**\*16** Here, the underlying facts are undisputed and the line of causation is clear: COVID-19 caused the Governor to issue the Proclamations, which forced Plaintiffs to curtail their business operations. Under such circumstances, the exclusion barring coverage resulting from the virus applies. See, e.g., Dolsen Cos. v. Bedivere Ins. Co., 264 F. Supp. 3d 1083, 1092–95 (E.D. Wash. 2017) (rejecting Efficient Proximate Cause argument where initial peril was an excluded harm and the alleged subsequent peril was "necessarily intertwined" with initial peril).[22]

c. Regulatory Estoppel

Plaintiffs argue that the doctrine of Regulatory Estoppel prohibits Defendants from relying on the Virus exclusion because "there are questions about whether insurers were forthcoming" with state insurance regulators, such as the Washington Office of the Insurance Commissioner, when first proposing to add such an exclusion to their policies. See Omnibus Reply at 62–65.

Regulatory Estoppel is a form of equitable estoppel which "prohibits parties from switching legal positions to suit their own ends." Brian Handel D.M.D., P.C. v. Allstate Ins. Co., 499 F. Supp. 3d 95, *4 (E.D. Pa. 2020) (quoting Sunbeam Corp. v. Liberty Mut. Ins. Co., 781 A.2d 1189, 1192 (Pa. 2001)). In this context, it would hold that "[i]f an insurer represents to a regulatory agency that new language in a policy will not result in decreased coverage, the insurer cannot assert the opposite position when insureds raise the issue in litigation." Id.

Plaintiffs admit that the Washington Supreme Court has not recognized Regulatory Estoppel but argue that this is not the same thing as formally rejecting it. Omnibus Resp. at 63– 64. This Court will not adopt a rule of law that the Washington Supreme Court has not adopted. As such, this Court declines to recognize the doctrine of Regulatory Estoppel on behalf of the State of Washington.

Based on the foregoing, where a policy includes a Virus exclusion, that exclusion also bars coverage for the losses alleged here.

D. Extra-Contractual Claims

The Court's holding construing the terms of the insurance policies resolves the Plaintiffs' Contractual Claims (i.e. their causes of action based on Declaratory Judgment and Breach of Contract). The Court has determined the meaning of the terms in question and established that the Defendants did not breach the terms of their insurance contracts by denying coverage.

The Parties debate, however, whether Plaintiffs' Extra-Contractual Claims (i.e., their causes of action based on Bad Faith, WCPA, IFCA, and Negligence) can survive absent a finding of coverage. Plaintiffs argue their Extra-Contractual Claims should survive, even if no coverage is found, because the insurers may still have acted improperly in handling their claims. Omnibus Resp. at 75–82. As their briefing contends, "[a]t the center of each Plaintiff's extracontractual claims is the well-founded contention that Defendants failed to conduct a reasonable investigation of the facts and the governing law relating to the claims, resulting in coverage determinations that were, in fact, unreasonable and unlawful." Id. at 89.

**\*17** Defendants contend that Plaintiffs' Extra-Contractual Claims should be dismissed along with their Contractual Claims, arguing that once there is a finding that their denial of coverage was justified, Plaintiffs failed to identify independent bad faith, negligence, or unfair practices to support their claims. Omnibus Reply at 72–82.

Reviewing Plaintiffs' operative Complaints, the Court concludes that Plaintiffs rest their Extra-Contractual Claims on nothing more than allegations that denial of coverage was unreasonable, done without sufficient

investigation, or simply reiterate the elements of the cause of action. This fails to satisfy the Twombly-Iqbal standard. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.").

As to claims premised on unreasonable denial, since the Court has found that COVID-19 does not cause physical loss or damage, denial of coverage on these grounds was reasonable. Therefore, any claims for bad faith, negligence, or under the WCPA or IFCA premised on these grounds must fail.

Plaintiffs' claims based on unreasonable investigation also fail. Defendants' denials of coverage were based on policy interpretations. There was no need for factual investigations. In these circumstances, the Court cannot say the quick denial of claims was unreasonable, frivolous, or unfounded. Defendants were faced with hundreds of identical claims based on the same causal event, namely COVID-19. As one court described,

> because defendant's denials were based on policy interpretations, not factual findings, it is not clear what would make those actions unreasonable under the circumstances. The facts underlying the claims, much like the facts underlying the present lawsuit, are largely, if not entirely, undisputed. And the speed with which defendant denied plaintiffs' claims cannot support a claim for unfair or deceptive trade practices.

Kamakura, LLC v. Greater N.Y. Mut. Ins. Co., No. 20-cv-11350, 2021 WL 1171630, at *14 (D. Mass. Mar. 9, 2021).

Based on the foregoing, the Court determines that Plaintiffs have largely failed to plead acts independent of unreasonable denial of coverage or investigation. Without independent grounds, which Plaintiffs have failed to allege, dismissal of Plaintiffs' Extra-Contractual Claims is appropriate.

E. Leave to Amend

Ordinarily, "[w]here a complaint is dismissed for failure to state a claim, 'leave to amend should be

granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.' " PBTM LLC v. Football Nw., LLC, No. 19-cv-2081, 2021 WL 37648, at *17 (W.D. Wash. Jan. 5, 2021) (quoting

Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)); see also Navajo Nation v. U.S. Dep't of the Interior, 996 F.3d 623, *6 (9th Cir. 2021) (quoting Polich v. Burlington N., Inc., 942 F.2d 1467, 1472 (9th Cir. 1991)) ("dismissal without leave to amend is improper unless it is clear...that the complaint could not be saved by any amendment.").

In the present cases, amendment would be futile. As COVID-19 does not cause direct physical loss of covered property, and such loss is required to trigger coverage, there is no way that Plaintiffs can amend their complaints to cure this deficiency. As such, the Court will deny Plaintiffs' claims with prejudice. See e.g., Seoul Taco Holdings, LLC v. Cincinnati Ins. Co., No. 20-cv-1249, 2021 WL 1889866, at *6 (E.D. Mo. May 11, 2021); M&E Bakery Holdings, LLC v. Westfield Nat'l Ins. Co., No. 20-cv-5849, 2021 WL 1837393, at *5, *7 (N.D. Ill. May 7, 2021); Jonathan Oheb MD, Inc. v. Travelers Cas. Ins. Co. of Am., No. 20-cv-08478, 2020 WL 7769880, at *4 (C.D. Cal. Dec. 30, 2020).

## V. INDIVIDUAL CASES

**\*18** The Court now applies its above findings to the ten consolidated cases, listed below by Defendant insurance company.

### A. Defendant Affiliated FM Insurance Company (No. 20-cv-01038)

#### 1. Case Background

This matter is made up of two constituent plaintiff groups who are insured by Affiliated FM. The first plaintiff group is Vancouver Clinic Inc. PS. See Vancouver Clinic Inc PS v. Affiliated FM Ins. Co., Order of Consolidation, No. 20-cv-05605, Dkt. No. 24. Vancouver Clinic is a professional association of physicians who operate eight medical clinics in the Vancouver, Washington area. Id., Am. Compl., Dkt. No. 8 ¶ 7 ("Vancouver Clinic Compl."). It has alleged the actual presence of COVID-19 in its clinics

and advances causes of action for declaratory relief, breach of contract, anticipatory repudiation of contract, insurance bad faith, and violations of the IFCA and WCPA. Id. ¶¶ 4, 33–36, 51–85.

The second plaintiff group is Aspen Lodging Group LLC, which owns and manages several hotels and restaurants under the Provenance Hotels brand. See Aspen Lodging, Compl., No. 20-cv-01038, Dkt. No. 1-2 ¶¶ 2, 26 ("Aspen Lodging Compl."). Aspen Lodging has not plead the actual presence of COVID-19 in its hotels and restaurants and its causes of action include declaratory judgment, breach of contract, insurance bad faith, and claims under the IFCA and WCPA. Id. ¶¶ 50–77. The Court consolidated these actions under Case No. 20-cv-01038.

Both Plaintiff groups' insurance policies are substantially similar[23] and include a general coverage provision based on physical loss or damage, entitled "Insurance Provided."[24] The Policies also contain two unique Communicable Disease provisions— one for Business Interruption[25] and the other for Property Damage[26] (the "Communicable Disease Provisions")— which provide coverage for losses if a communicable disease is detected at the insured property. Unlike the Insurance Provided provision, the Communicable Disease Provisions do not contain a physical loss trigger and, thus, must be addressed independently. Recovery under the Communicable Disease Provisions is capped according to sub-limits.[27]

**\*19** Additionally, the Policies include a Civil or Military Authority extension[28] that contains a physical loss trigger and a Contamination exclusion that bars coverage of losses associated with a "contamination."[29]

Both groups and Affiliated FM have filed Cross-Motions for Partial Summary Judgment.[30]Additionally, both Vancouver Clinic and Aspen Lodging have submitted Motions for Judicial Notice.[31] As the Court will resolve the Parties' claims without reference to these documents, the Court will deny the Motions for Judicial Notice as moot.

## 2. Vancouver Clinic Plaintiff

Affiliated FM admits Vancouver Clinic is entitled to coverage under the Communicable Disease Provisions as Vancouver Clinic has plead the actual presence of COVID-19. See Affiliated FM's Vancouver Clinic Mot. at 2. Affiliated FM argues that these Provisions, however, are unique and distinct from coverage under the broader Insurance Provided provision and, thus, Vancouver Clinic's recovery should be limited to the caps associated with the Communicable Disease Provisions, rather than the full policy limit. See id. at 20–21. Affiliated FM denies coverage under the general Insurance Provided provision according to the familiar argument that COVID-19 does not cause direct physical loss or damage. See Id. at 12–17.

Vancouver Clinic counters that it should be entitled to the full policy limit. See Vancouver Clinic's Mot. at 1–5. Specifically, it argues that COVID-19 causes direct physical loss or damage, see id. at 16–26, and that the policy does not limit Vancouver Clinic's recovery exclusively to the Communicable Disease provisions once a single peril implicates coverage under multiple provisions, see id. at 10–12, 15–16.

### a. Coverage

**\*20** As the Court has determined that COVID-19 does not cause physical loss or damage, coverage is not triggered under the general Insurance Provided provision. Thus, Vancouver Clinic's recovery is limited to the Communicable Disease provisions, which, by their terms, do not include a physical loss or damage requirement.

Additionally, the Court is unpersuaded by Vancouver Clinic's argument that Affiliated FM's admission of coverage under the Communicable Disease provisions necessarily means that there is coverage under the Insurance Provided provision. See Vancouver Clinic's Mot. at 12–15. The Communicable Disease provisions apply when the disease is present, making it distinct from the Insurance Provided provision, which requires physical loss or damage. Thus, the fact that the Communicable Disease Provisions are applicable does not reverse-activate the Insurance Provided provision.[32]

### b. Recovery Limitations

Once determined that coverage is limited to the caps associated with the Communicable Disease provisions, the Parties debate the exact amount Vancouver Clinic is entitled to recover. Each Provision has a $100,000 sub-limit cap. Vancouver Clinic argues that it is entitled to these sub-limits for each location with the reported presence of COVID-19, totaling $1.6 million. Vancouver Clinic's Mot. at 15 n.4. Affiliated FM argues that Vancouver Clinic is entitled only to $200,000 total as each Communicable Disease provision has an annual aggregate of $100,000. Affiliated FM's Vancouver Clinic Mot. at 20–21.

**\*21** Reviewing the relevant sub-limits provided for in the Policy, it is clear that Vancouver Clinic is entitled to a maximum of $200,000. Both Communicable Disease provisions' caps state that they are subject to an annual aggregate. Vancouver Clinic Policy at 11, 12. "Annual aggerate" is a defined term within the Policy, to wit: "the Company's maximum amount payable during any policy year." Id. at 61. The language of this definition is clear; the insurance company will pay no more than the identified cap in a single year. It matters not whether COVID-19 was present at one or multiple Vancouver Clinic locations. The Policy's coverage maximum under each relevant provision is $100,000. As the Court has found that these are the only applicable coverage provisions within the Policy, coverage is set at $200,000 total.

### c. Extra-Contractual Claims

Finally, Vancouver Clinic advances Extra-Contractual Claims for insurance bad faith and violations of the WCPA and IFCA. Reviewing Vancouver Clinic's Complaint, the Court determines that its Extra-Contractual Claims are based on Affiliated FM's denial of coverage, an allegation of improper investigation, and conclusory claims that Affiliated FM violated industry standards or engaged in deceptive practices, none of which are supported by allegations in the Complaint. See Vancouver Clinic Compl. ¶¶ 75–76, 80, 84. Based on the Court's reasoning above, these claims will be dismissed.

## 3. Aspen Lodging Plaintiffs

Unlike Vancouver Clinic, Affiliated FM denies coverage to Aspen Lodging in total because Aspen Lodging has not plead the actual presence of the virus, which is a precondition to finding coverage under the Communicable Disease Provisions. See Affiliated FM's Aspen Lodging Mot. at 2.

Aspen Lodging adopts the arguments advanced by Vancouver Clinic regarding coverage under the broader Insurance Provided provision. See Aspen Lodging's Mot. at 1. In addition to those arguments, Aspen Lodging argues it is entitled to coverage under the Civil and Military Authority extension. See id. at 7–13.

Affiliated FM argues that the Civil and Military Authority extension does not provide independent coverage. Affiliated FM's Aspen Lodging Mot. at 6–7. Additionally, Affiliated FM raises a choice of law question on the grounds that the majority of Aspen Lodging's contacts are in the State of Oregon and, thus, Oregon law should control. Affiliated FM's Aspen Lodging Mot. at 7–15. The Court addresses the choice of law issue first.

a. Choice of Law
It is unnecessary for the Court to conduct a choice of law analysis as Affiliated FM has failed to demonstrate an actual conflict between the laws of Washington and Oregon. When a federal district court sits in diversity, as here, it "must follow the choice-of-law rules of the State in which it sits." Veridian Credit Union v. Eddie Bauer, LLC, 295 F. Supp. 3d 1140, 1149 (W.D. Wash. 2017) (quoting Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex., 571 U.S. 49, 65 (2013)). Washington choice of law rules follow a two-step process, first determining whether an actual conflict exists before determining which jurisdiction has the most significant relationship. Id. at 1149–50 (citing Burnside v. Simpson Paper Co., 864 P.2d 937, 941 (Wash. 1994) and Johnson v. Spider Staging Corp., 555 P.2d 997, 1000–01 (Wash. 1976)). If no conflict exists, Washington law applies. Id. at 1149. An "actual conflict" exists "when the states' laws could produce different outcomes on the same legal issue." Id. (quoting Kelley v. Microsoft Corp., 251 F.R.D. 544, 550 (W.D. Wash. 2008)).

In support of its claim of "actual conflict" between Washington and Oregon law, Affiliated FM points to Washington Senate Bill 5351 currently pending in the Washington Legislature. See S.B. 5351, 67th Leg., Reg. Sess. (Wash. 2021).[33] Under its terms, Washington law would be amended to provide that the loss of the ability to use an insured property as a result of COVID-19 is considered a physical loss of or damage to the property, entitling the policyholder to coverage. See S.B. 5351, 67th Leg., Reg. Sess. (Wash. 2021).[34] But, this Bill is not law, which means Affiliated FM's asserted conflict is purely hypothetical. The Court is unaware of an Oregon Court ruling on this issue yet, let alone a ruling on this issue in a manner contrary to this Court's conclusions. The Court, therefore, finds no conflict and will continue to apply Washington law as it presently exists.

b. Coverage
**\*22** Aspen Lodging's claims for coverage must fail. Aspen Lodging is not entitled to coverage under the general Insurance Provided provision because it has not suffered physical loss of or damage to property. It is not entitled to coverage under the Communicable Disease Provisions because it did not plead that the COVID-19 virus was found at any of its locations, a requirement for coverage under this extension.

Finally, Aspen Lodging's claim to coverage under the Civil and Military Authority extension fails for all the reasons the Court discussed above. Specifically, Aspen Lodging's Civil and Military Authority extension requires that a property within five statute miles of covered property be affected by "physical damage of the type insured." As the Court has already held, COVID-19 does not cause such loss or damage, either to Aspen Lodging's properties or to properties nearby.

For these reasons, the Court will grant Affiliated FM's Motion and deny Aspen Lodging's Motion.

c. Extra-Contractual Claims
Reviewing Aspen Lodging's Complaint, the Court determines that its Extra-Contractual Claims are based

on Affiliated FM's denial of coverage, an allegation of improper investigation, and conclusory allegations. See Aspen Lodging Compl. ¶¶ 61, 67, 71–76. Based on the Court's reasoning above, it will dismiss these claims.

### B. Defendant Aspen American Insurance Company (20-cv-00616)

#### 1. Case Background

Prior to consolidation, five plaintiffs advanced claims against Aspen American Insurance Company.[35] The Court consolidated all five actions under the Marler case. See Marler, Order of Consolidation, No. 20-cv-00616, Dkt. No. 41. After consolidation, four of the Plaintiffs (Marler, Aylen, Jagow, and Mikkelson) filed a consolidated amended class action complaint, advancing only two causes of action: declaratory judgment and breach of contract. Marler, Consolidated Am. Class Action Compl., No. 20-cv-00616, Dkt. No. 43 ¶¶ 87–99. Plaintiff Tabaraie filed a separate, non-class action complaint advancing causes of action for declaratory judgment, breach of contract, failure to act in good faith, and a claim under the WCPA. Id., Pl. Tabaraie's Second Am. Compl., Dkt. No. 46 ¶¶ 102–134 ("Tabaraie Compl.").

After the original five Aspen American Plaintiffs filed their post-consolidation complaints, an additional case filed a class action complaint against Aspen American. See Manley DDS v. Aspen Am. Ins. Co., No. 21-cv-00342. The case was reassigned to the undersigned, id., Dkt. No. 4, and the Plaintiffs agreed to consolidation with Marler and adoption of the briefing already pending therein, id., Resp., Dkt. No. 7 at 1. As such, the Court ordered Manly consolidated with Marler under case number 20-cv-00616. Id., Min. Order, Dkt. No. 8.

#### 2. Disposition

##### a. Coverage

All Plaintiffs advancing claims against Aspen America were issued the materially same insurance policy. See Marler, Def. Aspen Am. Ins. Co.'s Mot. to Dismiss Consolidated Class Action Compl. and Tabaraie Compl., No. 20-cv-00616, Dkt. No. 51 at 1, 3 ("Aspen's Mot."). For convenience, when referring to

the relevant insurance policies, the Court will reference the policy of Wade K. Marler DDS. Id., Decl. of Robin Wechkin, Ex. A, Dkt. No. 51-1 ("Marler Policy"). This Policy includes the familiar Coverage Agreement, which agrees to "pay for all direct physical damage to covered property at the premises described on the Declarations caused by or resulting from any covered cause of loss." Id. at 8. "Covered Cause of Loss" is defined as "ALL RISK OF DIRECT PHYSICAL LOSS except as excluded or limited in Section II. of this Coverage Part." Id. at 25. The Policy defines "Damage" to include "partial or total loss of or damage to your covered property." Id. at 26.

**\*23** The Policy also includes coverage for Practice Income, Extra Expense, and Extended Practice Income. Id. at 10, 11. All three provisions are contingent on direct physical loss or damage.[36]

The Policy also includes a Civil Authority provision, which in this instance acts as a coverage extension to the practice income coverage. See id. at 11 ("We will also pay for the following expenses:"), 14 (Civil Authority: "We will pay for the actual loss of practice income and rents you sustain caused by action of civil authority that prohibits access to the described premises due to the direct physical damage to property, other than at the described premises, caused by or resulting from any covered cause of loss."). Again, as demonstrated in this excerpt, physical loss or damage is a prerequisite to coverage under the Civil Authority.

As illustrated by the recitation of the policy provisions above, the Aspen American Plaintiffs' claims to coverage fail given the Court's finding that COVID-19 does not cause direct physical loss or damage. All of the coverage provisions include requirements for "direct physical damage" caused by a "covered cause of loss," which, in turn, requires a "direct physical loss."

##### b. Plaintiff Tabaraie's Extra-Contractual Claims

Tabaraie's Extra-Contractual Claims (for Bad Faith and WCPA) fail as well. Reviewing the relevant Complaint, the Extra-Contractual Claims are premised on Aspen American's denial of coverage, an allegation of unreasonable investigation, and conclusory claims that Aspen American violated industry standards

or engaged in deceptive practices, none of which are supported by allegations in the Complaint. See Tabaraie Compl. ¶¶ 116–118, 122–127.

The Court will grant Aspen American's Motion to Dismiss and dismiss all the claims against Aspen American Insurance Company.

## C. Defendant CNA Financial Corporation (20-cv-00809)

### 1. Case Background

This matter consists of five separate plaintiff groups (McCulloch, Noskenda, Hong DDS, Hong PLLC, and Owens Davies) and three separate insurance companies (Valley Forge Insurance Company, Transportation Insurance Company, and National Fire Insurance Company of Hartford) consolidated around a common parent company.[37] As each of the three insurance companies named is a subsidiary of CNA Financial Corporation, the Court consolidated these matters under the McCulloch case. See McCulloch, Order on Consolidation, No. 20-cv-00809, Dkt. No. 38.

 **\*24** After consolidation, four of the five plaintiff groups, including McCulloch, Hong PLLC, Hong DDS, and Noskenda filed a consolidated class action Complaint. See Consolidated Am. Class Action Compl., No. 20-cv-00809, Dkt. No. 40.

According to the consolidated Complaint, the Plaintiffs, four dental business and one print shop, id. ¶¶ 5–19, advance causes of action for declaratory relief and breach of contract, id. ¶¶ 91– 103. The policies issued to each of the Plaintiffs represented by this Complaint are materially identical in most relevant respects. See id. at ¶ 22; see also McCulloch, Decl. of H. Christopher Boehning, Exs. A–D, No. 20-cv-00809, Dkt. Nos. 51-1–51–4 (Policies of McCulloch, Hong PLLC, Hong DDS, and Noskenda). The only difference in insurance policies is that the policy of Hong DDS includes an extra endorsement for Business Income for Interruption of Practice. See McCulloch, Decl. of H. Christopher Boehning, Ex. B, No. 20-cv-00809, Dkt. No. 51-2 at 88 ("Hong DDS Policy").

The fifth plaintiff group, Owens Davies, did not file a post-consolidation complaint and, thus, its pre-consolidation complaint remains operative. See Owens Davies, Compl., No. 20-cv-06155, Dkt. No. 1 ("Owens Davies Compl."). According to this complaint, Owens Davies owns and operates a law firm in Olympia, Washington. Id. ¶ 5. Its Complaint does not include class allegations. See generally id. Owens Davies advances causes of action for declaratory relief, breach of contract, insurance bad faith, negligence, and claims under the WCPA and IFCA, id. ¶¶ 70–91. The Firm's insurance policy does not materially differ from those of the first set of CNA Plaintiffs, except that it includes the same Business Income for Interruption of Practice endorsement as Hong DDS. See McCulloch, Defs.' Mot. to Dismiss Compl., No. 20-cv-00809, Dkt. No. 50 at 5–8 ("CNA's Mot. to Dismiss"); McCulloch, Decl. of H. Christopher Boehning, Ex. E, No. 20-cv-00809, Dkt. No. 51-5 at 83 ("Owens Davies Policy").

As the policies are materially the same, the Court will cite only to the Policy of Owens Davies in describing the terms of insurance. In the Businessowners Special Coverage Form, the Coverage clause provides that the insurer "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations cause by or resulting from a Covered Cause of Loss." Owens Davies Policy at 19. "Covered Cause of Loss" is defined as "RISKS OF DIRECT PHYSICAL LOSS" unless otherwise excluded. Id. at 20.

The Policy also includes an endorsement (effectively an extension) for Business Income and Extra Expenses, including provisions for Business Income, id. at 41,[38] Extra Expense, id. at 42,[39] and Extended Business Income, id. at 42.[40] It also includes an endorsement for Civil Authority coverage. Id. at 67.[41]

### 2. Disposition

#### a. Coverage

 **\*25** Defendants argue there is no coverage under all of the aforementioned provisions based on the fact that COVID-19 does not cause physical loss or damage. See CNA's Mot. to Dismiss at 11–18. Given that the Court has already concluded that COVID-19 does not

cause physical loss or damage, it finds no coverage under the terms of the insurance policies.

b. Business Income for Interruption of Practice Endorsement

Owens Davies and Hong DDS's arguments relevant to their Business Income for Interruption of Practice endorsement, see Omnibus Resp. at 51–3, also fail. This provision states:

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS SPECIAL PROPERTY COVERAGE FORM BUSINESS INCOME AND EXTRA EXPENSE

The following coverage is added to your Businessowners Special Property Coverage Form:

Except as otherwise stated in this endorsement, the terms and conditions of the policy apply to the insurance stated below.

This insurance applies only when Business Income Coverage is included with the policy.

1. The following changes are made to the coverages of Business Income and Extra Expense, Civil Authority, and Utility Services - Time Element, if attached to this policy:

For Loss of Business Income at each scheduled location affected by the suspension of your "operations" we will pay:
a. The daily limit shown in the Declarations without reduction for discontinuing expenses or rescheduled clients, but only for the initial 30 days of loss, or portion of a day, for each occurrence, or

b. The actual loss of Business Income during the "period of restoration."

For each occurrence you can select either a. or b. above....Owens Davies Policy at 83.

Owens Davies and Hong DDS claim that the Endorsement "expanded [the] coverage" provided by their policies and ties it to a " 'suspension of

operations,' regardless of whether [the insured] ha[s] also suffered a physical loss of or damage to property." Omnibus Resp. at 51. In other words, they claim the Endorsement provided a separate ground for establishing coverage not tied to the physical loss and damage requirements of the Business Income, Extra Expense, Extended Business Income, and Civil Authority provisions.

Reviewing the Endorsement, the Court determines that it does not establish independent grounds for coverage. As it makes clear, "[e]xcept as otherwise stated in this endorsement, the terms and conditions of the policy apply to the insurance stated below." Id. In other words, the Endorsement does not otherwise change the requirements of Business Income and Extra Expense coverage, including that physical loss or damage be present in order to trigger coverage.

Instead, as Defendants point out, a straightforward reading of the Endorsement leads to the conclusion that it "provides an alternative method for calculating lost income under the existing Business Income, Extra Expense, and Civil Authority coverages" all of which require physical loss or damage in the first instance. Omnibus Reply at 42; see also id. at 42–46. In other words, the Endorsement claims only to modify the coverage provided in the Business Owners Special Property Coverage Form by providing two options to calculate what the insurer will pay, including (with further limitations) "a. the daily limit shown in the Declarations" or "b. the Actual loss of Business Income during the 'period of restoration" and then gives the insured the opportunity "[f]or each occurrence you can select either a. or b. above." Owens Davies Policy at 83. Thus, Owens Davies and Hong DDS cannot rely on the Endorsement to provide coverage where the policy does not otherwise establish coverage.

c. Extra-Contractual Claims

**\*26** Only Owens Davies advances Extra-Contractual Claims (for bad faith, negligence, WCPA, and IFCA). Reviewing its Complaint, the Court determines that its Extra-Contractual Claims, in addition to wrongful denial of coverage, are based on allegations of incomplete investigation and unfair practices too conclusory to withstand dismissal. See Owens Davies Compl. ¶¶ 81, 83, 85, 87–88, 90.

Based on the foregoing, the Court will grant the CNA Defendants' Motion and dismiss these actions.

### D. Defendant Fireman's Fund Insurance Company (20-cv-01079)

#### 1. Case Background

Prior to consolidation, four cases advanced claims against Fireman's Fund.[42] The Court consolidated these matters under Vita Coffee. See Vita Coffee, Order on Consolidation, 20-cv-01079, Dkt. No. 36.

On January 8, 2021, Plaintiff Weimac LLC also filed suit against Fireman's Fund. See Weimac LLC v. Fireman's Fund Ins. Co., No. 21-cv-0025. Based on the similarity in claims, the Court ordered the action consolidated with Vita Coffee. See id., Min. Order, Dkt. 6.

None of these five plaintiff groups refiled their complaints after consolidation, so their pre-consolidation complaints remain operative.[43] All include Extra-Contractual Claims.[44] Additionally, none pleads the actual presence of COVID-19 on their premises.

Because each plaintiff group retained separate operative Complaints, Fireman's Fund filed separate Motions to Dismiss.[45] Fireman's Fund filed its Motion to Dismiss against ES Restaurant prior to consolidation and did not refile it post-consolidation. ES Restaurant, Def.'s Mot. to Dismiss Compl., No. 20-cv-01193, Dkt. No. 4 ("ES Mot. to Dismiss").[46]

After Fireman's Fund filed its Motions to Dismiss, one additional Plaintiff filed suit against it, see Canlis Inc v. Fireman's Fund Ins. Co., No. 21-cv-00373, and another plaintiff group filed suit against National Surety Corporation, which is a subsidiary of Fireman's Fund, see 13 Coins Mgmt. LLC v. Nat'l Surety Corp., No. 21-cv-00178. The Plaintiffs in each of these actions agreed to consolidation with Vita Coffee and to be bound by the Court's rulings regarding the existing Motions.[47]

#### 2. Disposition

**\*27** Fireman's Fund's Motions raise many of the same arguments addressed in the General Findings section. For example, Fireman's Fund argues that Plaintiffs fail to establish a covered loss; that there is no coverage under Civil Authority provisions; and that Virus exclusions also bar coverage.[48] Additionally, Fireman's Fund asserts that ES Restaurant and Naccarato fail to establish coverage under a unique Crisis Event Business Income provision.[49]

In response, the Vita Coffee and Worthy Plaintiffs offered three other provisions— Communicable Disease Coverage, Dependent Property Coverage, and Business Access Coverage extensions—which they claim as independent grounds for coverage.[50]

#### a. Coverage

The Court finds that the Policies at issue[51] do not differ from those examined in the General Findings section and, thus, the same findings apply, namely that Plaintiffs have failed to show a covered loss, there is no independent coverage under the Civil Authority provision, and the Virus exclusion further bars coverage.

First, each of the Policies relies on "direct physical loss or damage" or "direct physical loss of or damage to" covered property to trigger coverage. See Vita Coffee Policy at 30.[52]

Second, each of the Policies contains a Civil Authority provision which also requires direct physical loss or damage. See Vita Coffee Policy at 42 ("Such prohibition of access to such location by civil authority must: (1) Arise from direct physical loss or damage to property other than at such location").[53]

Third, the Policies of Vita Coffee, Worthy, and Weimac contain applicable Virus exclusions (here called "Mortality and Disease"). See Vita Coffee Policy at 32; Worthy Policy at 34; Weimac Policy at 43.

For all the reasons previously found, the policies do not provide coverage.

b. ES Restaurant and Naccarato's Crisis Event Business Income Provision

The ES Restaurant and Naccarato Policies contain a unique Crises Event Business Income extension, which provides:

We will pay for the actual loss of crisis event business income you sustain due to the necessary suspension of your operations during the crisis event period of restoration. The suspension must be caused by or result from a covered crisis event at your covered premises.

Naccarato Policy at 81; ES Policy at 91.

A "covered crisis event" includes:

b. Premises contamination. Necessary closure of your covered premises due to any sudden, accidental and unintentional contamination or impairment of the covered premises or other property on the covered premises which results in clear, identifiable, internal or external visible symptoms of bodily injury, illness, or death of any person(s). This includes covered premises contaminated by communicable disease, Legionnaires' disease, but does not include premises contaminated by other pollutants or fungi.

 **\*28** Naccarato Policy at 84; ES Policy at 94 (emphasis added).

Here, both ES Restaurant and Naccarato's Complaints fail to plead sufficient facts to show they fulfilled either requirement. Both Complaints fail to plead a "necessary closure." For example, while Naccarato's Complaint claims the restaurant permanently closed due to financial hardship, it also states that the restaurant was able to remain open for take-away orders. Naccarato Compl. ¶ 14. Thus, it cannot show a necessary closure as a result of COVID-19. Similarly, ES Restaurant's Complaint claims that it closed its restaurants on March 16, 2020 and switched to carry-out service at several of its locations. See ES Compl. ¶¶ 31, 42. The same then applies.

As such, there is no independent coverage established by the Crisis Event Business Income provision.

c. Communicable Disease Coverage, Dependent Property Coverage, and Business Access Coverage Extensions

Finally, the Vita Coffee and Worthy Plaintiffs rely on three extensions to claim independent grounds for coverage.

First, the Communicable Disease Coverage extension provides We will pay for direct physical loss or damage to Property Insured caused by or resulting from a covered communicable disease event at a location including the following necessary costs incurred to:

(a) Tear out and replace any part of Property Insured in order to gain access to the communicable disease;

(b) Repair or rebuild Property Insured which has been damaged or destroyed by the communicable disease; and

(c) Mitigate, contain, remediate, treat, clean, detoxify, disinfect, neutralize, cleanup, remove, dispose of, test for, monitor, and assess the effects [of] the communicable disease.

Vita Coffee Policy at 45–46; Worthy Policy at 49–50.

The policy defines "communicable disease" as "any disease, bacteria, or virus that may be transmitted directly or indirectly from human or animal to human" and a "communicable disease event" as "an event in which a public health authority has ordered that a location be evacuated, decontaminated, or disinfected due to the outbreak of a communicable disease at such location." Vita Coffee Policy at 76; Worthy Policy at 83.

This Provision, however, fails to provide coverage for two reasons. First, it requires direct physical loss and damage, which COVID-19 does not cause when present. Second, neither Plaintiff has claimed the actual presence of COVID-19, which is required as a "communicable disease event" must take place at the "location" of "Property Insured." As neither business documented the presence of COVID-19 on their premises, no public health authority issued an order specifically evacuating either premises in order to decontaminate or disinfect a known outbreak.[54]

**\*29** Next, the Dependent Property Coverage extension provides:

(1) We will pay for actual loss of business income and necessary extra expense you sustain due to the necessary suspension of operations during the period of restoration at a location.

(2) The suspension must be due to direct physical loss or damage at the location of a dependent property, situated inside or outside of the Coverage Territory, caused by or resulting from a covered cause of loss.

Vita Coffee Policy at 42; Worthy Policy at 45.

Again, the Provision requires direct physical loss or damage, which the Court has held COVID-19 does not cause.

Finally, the Business Access Coverage extension is also unavailable because it too relies on physical loss or damage. As it provides,

We will pay for the actual loss of business income and necessary extra expense you sustain due to the necessary suspension of operations at a location if access to such location is impaired or obstructed. Such impairment or obstruction must: (1) Arise from direct physical loss or damage to property other than at such location; and (2) Be caused by or result from a covered cause of loss;

Vita Coffee Policy at 42; Worthy Policy at 44.

Based on the foregoing, none of the three extensions provide independent grounds for coverage. No Fireman's Fund Plaintiff has established a claim for coverage under its policy.

### 3. Extra-Contractual Claims

Reviewing the Fireman's Fund Plaintiffs' operative Complaints, the Court determines that none has plead conduct independent of unreasonable denial of claims, insufficient investigation, and conclusory claims of deceptive practices sufficient to support their Extra-Contractual Claims. See Vita Coffee Compl. ¶¶ 4.3, 4.13, 4.15; ES Compl. ¶¶ 65, 68–71, 79; Worthy Compl. ¶¶ 78– 79, 86, 90, 98–99; Naccarato Compl. ¶¶ 49–51, 54; Weimac Compl. ¶¶ 71–73, 78–79, 84. As such, these claims also fail.

Based on the foregoing, the Court will grant Fireman Fund's Motions to Dismiss, and dismiss all claims against it.

### E. Defendant Hanover Insurance Group, Inc. (20-cv-05437)

#### 1. Case Background

Two actions are advanced against Hanover subsidiaries. The first is Caballero v. Mass. Bay Ins. Co., No. 20-cv-05437. As part of consolidated briefing, Massachusetts Bay filed its Motion to Dismiss Caballero's claims on January 15, 2021. Id., Def.'s Rule 12 Mots. Against Pl.'s First Am. Compl., Dkt. No. 56 ("Mass. Bay's Mot. to Dismiss"). Caballero opposed this Motion through the Omnibus Response. Id., Pls.' Omnibus Opp'n to Defs.' Mots. to Dismiss, Dkt. No.

63.

The second action is Walker & Kraus DDS PLLC v. Citizens Ins. Co. of Am., No. 21-cv-00345, which was filed on March 12, 2021. As Massachusetts Bay's Motion to Dismiss was already pending in the Caballero action, and the claims were substantially similar, the Parties in Walker & Kraus agreed to consolidate with Caballero, adopt the Motion to Dismiss filed therein, and abide by this Court's ruling resolving the Motion. Id., Dkt. No. 13 (Stipulation and Order on Consolidation).

#### 2. Disposition

Massachusetts Bay's Motion raises all the familiar grounds: lack of direct physical loss or damage; lack of coverage under Extended Business Income Coverage, Civil Authority, Denial of Access Coverage extensions; and applicability of a Virus exclusion. Mass. Bay's Mot. to Dismiss at 7–16.

**\*30** Examining Caballero's Policy, the Court finds all of its general findings apply. First, the Policy requires "direct physical loss of or damage to a described premises" in order to trigger coverage. Caballero Policy at 66. The Extended Business Income and Civil Authority extensions require coverage for Business Income as a condition precedent. Id. at 67 (Extended

Business Income: "If no Business Income Coverage is provided under this Coverage Form, then there is no Extended Business Income Coverage afforded under this Coverage Form"); 69 (Civil Authority: "When Business Income Coverage is provided under this Coverage Form...").

The Civil Authority and Denial of Access to Premises extensions also explicitly require "direct physical loss or damage to property within one mile of the described premises." Id. at 69; see also id. at 25 (Denial of Access to Premises extension).[55] Finally, the Policy includes an applicable Virus or Bacteria exclusion. Id. at 98. As such, the Policy does not provide coverage in these circumstances.

Caballero's Complaint does not include Extra-Contractual Claims. See Caballero, Compl.–Class Action, No. 20-cv-05437, Dkt. No. 1. The Court will grant Massachusetts Bay's Motion and dismiss the claims against Hanover in their entirety.

**F. Defendant The Hartford Financial Services Group (20-cv-00627)**

1. Case Background
Prior to consolidation, twelve separate cases advanced claims against three Hartford subsidiaries.[56] The Court consolidated these matters under the Chorak case. Chorak, Order on Consolidation, No. 20-cv-00627, Dkt. No. 38. After consolidation, two additional cases filed suit against a Hartford subsidiary. See Seuk v. Sentinel Ins. Co. Ltd., 21-cv-00346; MD Spektor DDS PLLC v. Sentinel Ins. Co. Ltd., 21-cv-00544. The Parties in these additional cases stipulated to consolidation with Chorak and adoption of the briefing pending at that time. Seuk, Stipulated Mot. and Order to Consolidate, 21-cv-00346, Dkt. No. 12; MD Spektor, Stipulated Mot. and Order to Consolidate, No. 21-cv-00544, Dkt. No. 9.

After consolidation, several Plaintiffs consolidated their Complaints into a single class action Complaint, while others chose to file amended Complaints in the consolidated action. Other Plaintiffs chose not to refile complaints and, thus, their pre-consolidation Complaints remain operative. The operative Complaints are as follows:

A. Plaintiffs Chorak, Kim, Prato, Lee, Glow Medispa, LLC, and KCJ Studios LLC: Chorak, Consolidated Am. Class Action Compl., No. 20-cv-00627, Dkt. No. 40 ("Class Action Compl.");

B. Plaintiff Strelow: Chorak, Pl. Strelow's Second Am. Compl. for Money Damages and Injunctive Relief, No. 20-cv-00627, Dkt. No. 48 ("Strelow Compl.");

**\*31** C. Plaintiff the Seattle Symphony Orchestra: Chorak, First Am. Compl., No. 20-cv-00627, Dkt. No. 49 ("Seattle Symphony Compl.");

D. Plaintiff J Bells, LLC: Chorak, Pl. J Bells, LLC DBA Bishops Cuts and Colors'

First Am. Compl., No. 20-cv-00627, Dkt. No. 50 ("J Bells Compl.");
E. Plaintiff SCRBKR 2017 LLC: SCRBKR2017 LLC, Compl., No. 20-cv-01537, Dkt. No. 1-1 ("SCRBKR Compl.");

F. Plaintiff Seattle Bakery LLC: Seattle Bakery LLC, Compl., No. 20-cv-01540, Dkt. No. 1-1 ("Seattle Bakery Compl."); and
G. Plaintiff Piroshky Piroshky Bakery LLC: Piroshky Piroshky Bakery LLC, Compl., No. 20-cv-01541, Dkt. No. 1-1 ("Piroshky Piroshky Compl.").

Several of these complaints advance Extra-Contractual Claims.[57]

In response to these various complaints, Hartford filed a single Motion to Dismiss. Chorak, Defs. Hartford Cas. Ins. Co., Hartford Fire Ins. Co., and Sentinel Ins. Co., Ltd.'s Mot. to Dismiss and Motion for J. on the Pleadings, No. 20-cv-00627, Dkt. No. 56 ("Hartford's Mot. to Dismiss"). The Motion advances the familiar contentions that all Plaintiffs have failed to show direct physical loss or damage and that no independent coverage is provided by the Civil Authority provision located in each business's policy. See id. at 6–20. Additionally, the Motion addresses an argument made by Seattle Symphony regarding a write-off of a Virus exclusion located in its policy. See id. at 20; see also Seattle Symphony Compl. ¶¶ 15–16, 49–50.

All Hartford Plaintiffs participated in the Omnibus Response. See Chorak, Pls.' Omnibus Opp'n to Defs.' Mots. to Dismiss, No. 20-cv-00627, Dkt. No. 64. In addition to signing onto all of the general arguments made therein, Seattle Symphony responded to Hartford's claims regarding its Virus exclusion write-off. Id. at 44–46. Also in the Omnibus Response, the "Piroshky Plaintiffs"[58] alleged independent grounds for coverage under two provisions in their policies: a Food Contamination Coverage and a Dependent Property Coverage provision. Id. at 47–50; see also SCRBKR Compl. ¶¶ 2.10, 2.12; Seattle Bakery Compl. ¶¶ 2.10, 2.12; Piroshky Piroshky Compl. ¶¶ 2.10, 2.12.

2. Coverage

**\*32** The Hartford Defendants issued the same Spectrum Business Owner's Policies to most of the Plaintiffs. See Hartford's Mot. to Dismiss at 2–3 n.1. The only outlier is the policy of Seattle Symphony, which is a Special Multi-Flex Business Insurance Policy. Id. at 2–3 n.2. The Court will refer to the policy of Dr. Mario Chorak, DMD, PS to exemplify the Spectrum Business Owner's Policies, see id., Ex. B, Dkt. No. 56-2 ("Chorak Policy"), as well as the Seattle Symphony's policy, id., Ex. M, Dkt. No. 56-13 ("Seattle Symphony Policy").

Both Policies rely on "direct physical loss of or damage to" covered property to trigger coverage in the first instance. Chorak Policy at 40;[59] Seattle Symphony Policy at 70.[60] Further, both Policies' Civil Authority provisions require direct physical loss. Chorak Policy at 32,[61] 41;[62] Seattle Symphony Policy at 56, 85.[63]

As such, for all the reasons detailed previously, the Court finds that the Policies fail to trigger coverage under either provision.

3. Seattle Symphony's Virus Exclusion

Seattle Symphony's arguments regarding its Virus exclusion write-off are not persuasive. The policy in question contains a "Fungus, Wet Rot, Dry Rot, Bacteria or Virus" exclusion, which excludes damages caused by the "[p]resence, growth, proliferation, spread or any activity of 'fungus,' wet rot, dry rot, bacteria or virus." Seattle Symphony Policy at 86. The Policy, however, also includes a Washington State

Specific Endorsement, which deletes this exclusion. Id. at 45.[64]

**\*33** Seattle Symphony argues that the Endorsement's removal of the Virus exclusion demonstrates "that the average purchaser of insurance would reasonably interpret the Hartford policy to extend coverage for the 'physical loss of or damage to' property caused by a virus." Omnibus Resp. at 45; see id. at 44–46. The Symphony's argument is that the inclusion of the Virus exclusion in the first instance demonstrates that "physical loss or damage" covers harms by viruses, which must then be excluded. Further, the endorsement's removal of the Virus exclusion then demonstrates the Parties' intent that the Symphony's Policy should cover such losses.

Hartford rebuts the Symphony's arguments, contending that removal of an exclusion cannot, by itself, create coverage where none exists in the first place. Omnibus Reply at 35–36. The Court agrees.

Reviewing the Policy, it is clear that the write-off does not seek to alter the requirement for direct physical loss or damage. Rather, it simply removes an exclusion. Seattle Symphony seems to concede as much, recognizing that the "endorsement deleting the virus exclusion [does not] override the plain language of the Hartford policy." Omnibus Resp. at 44. Instead, its argument is that the endorsement merely "provides further evidence that Hartford intended the policy to extend coverage for 'physical loss of or damage to' property." Id. The Court, however, has found that the term does not include the losses Seattle Symphony alleges, and deletion of an exclusion does not provide sufficient evidence to conclude otherwise.

4. Piroshky Plaintiffs' Additional Grounds for Coverage

The Piroshky Plaintiffs allege that additional grounds for coverage are found in the Food Contamination Coverage and Dependent Property Coverage provisions located in their policies.[65] See Omnibus Resp. at 47–50. Hartford argues that neither provision creates independent grounds for coverage. See Omnibus Reply at 36–42. Hartford is correct.

a. Food Contamination Coverage

The Food Contamination Coverage provision states that

> We will pay the actual loss of Business Income and Extra Expense if your "operations" at any "scheduled premises" are ordered by a government authority to be suspended due to the discovery of or the suspicion of "food contamination."

Piroshky Policy at 143.

The Policy defines "Food Contamination" as

> The incidence of food poisoning to one or more of your patrons that is caused by or results from tainted food you purchased, improperly stored, handled or prepared, or a communicable disease that was transmitted by you or one or more of your employees.

Id.

The Piroshky Plaintiffs contend that the Food Contamination Coverage provision provides coverage independent of the presence of direct physical loss or damage and does not require actual food contamination, instead merely the suspicion of food contamination or the transmission directly from waiter to patron. Omnibus Resp. at 47–49. Hartford argues there is no coverage under the Food Contamination Coverage provision because (1) the restaurants' operations were not suspended as they continued to conduct carry out and delivery service throughout the pandemic; (2) they cannot show an incidence of "food poisoning"; and (3) the Governor's Proclamations were not based on the discovery or suspicion of a food contamination, but, instead, based on a global pandemic. Omnibus Reply at 36–39.

**\*34** The Court finds the Provision inapplicable. COVID-19 is not a food-borne illness, as it is transmitted through exposure to the airborne respiratory fluids of contagious individuals. Adopting the Piroshky Plaintiffs' theory that a food contamination provision is applicable because of waiter-patron transmission regardless of the presence of a food-borne illness would strain the Provision beyond recognition. See, e.g., Food Poisoning, Merriam-Webster.com, https://www.merriam-webster.com/

dictionary/food%20poisoning (last visited May 28, 2021) (defining food poisoning as "an acute gastrointestinal disorder caused by bacteria or their toxic products or by chemical residues in food."). Furthermore, Plaintiffs fail to point to any incidence of food poisoning or food contamination. See Nashville Underground, LLC v. AMCO Ins. Co., No. 20-cv-00426, 2021 WL 826754, at \*4–\*11 (M.D. Tenn. Mar. 4, 2021) (finding similar Food Contamination provision did not provide coverage as a result of COVID-19); see also Whiskey River on Vintage, 2020 WL 7258575, at \*17.

b. Dependent Property Coverage

The Dependent Property Coverage provision states that

> We will pay for the actual loss of Business Income you sustain due to direct physical loss or physical damage at the premises of a dependent property caused by or resulting from a Covered Cause of Loss.

Piroshky Policy at 43.

The Piroshky Plaintiffs claim that the Dependent Property Coverage provision triggers coverage when COVID-19 positive clients (who are themselves suffering direct physical loss or damage from the virus) fail to frequent their restaurants due to the disease. Id. at 49–50. Defendants argue the Dependent Property Coverage does not apply based on the fact that it too requires direct physical loss or damage. Omnibus Reply at 39–42.

The Piroshky Plaintiffs' argument fails. The Dependent Property Coverage provision relies on direct physical loss or physical damage, which the Court has held that COVID-19 does not cause to property. Furthermore, Plaintiffs' strained theory that its clientele constitutes dependent property who are themselves suffering physical damage is untenable. The Policy defines "Dependent Property" as "property owned, leased or operated by others whom you depend on to:...(b) Accept your products or services." Piroshky Policy at 42. This was clearly not intended to include restaurant patrons.

5. Extra-Contractual Claims

Based on the foregoing, the Court finds no coverage under any of the applicable policies. Reviewing the relevant Complaints, the Court determines that all of the plead Extra-Contractual Claims should also be dismissed as they are premised on allegations of unreasonable denial of coverage, incomplete investigations, and conclusory allegations of violations of consumer protection regulations which are unsupported by Plaintiffs' Complaints.[66]

The Court will grant Hartford's Motion to Dismiss in its entirety.

### G. Defendant Liberty Mutual Holding Company Inc. (20-cv-00620)

#### 1. Case Background

Prior to consolidation, three plaintiffs (Pacific Endodontics PS, Hirbod H. Rowshan DDS PS, and Cascadia Dental Specialists Inc.) advanced claims against Liberty Mutual subsidiaries.[67] The Court consolidated these actions under the Pacific Endodontics case. Pacific Endodontics, Order on Consolidation, No. 20-cv-00629, Dkt. No. 37.

The Plaintiffs in these actions did not refile their Complaints post consolidation. As such, their pre-consolidation Complaints remain operative.[68] None advance Extra-Contractual Claims.

**\*35** Liberty Mutual filed only one Motion for Judgment on the Pleadings to dismiss all three actions. Pacific Endodontics, Defs. Am. Fire and Cas. Co., the Ohio Ca. Ins. Co., and Ohio Sec. Ins. Co.'s Mot. for J on the Pleadings, No. 20-cv-00629, Dkt. No. 46 ("Liberty Mutual' s Mot."). The Motion includes the familiar arguments regarding lack of direct physical loss or damage, Civil Authority coverage, and Virus exclusion. Id. at 7–21. All three Plaintiffs jointly filed the Omnibus Response in opposition. Id., Omnibus Resp., Dkt. No. 53.

#### 2. Disposition

All three policies fail to provide coverage.[69] All three Policies are contingent on "direct physical loss of or damage to Covered Property." Pacific Endodontics Policy at 39; Cascadia Policy at 37; Rowshan Policy at 41. The Policies' Civil Authority extensions also require physical loss or damage. Pacific Endodontics Policy at 48; Cascadia Policy at 46; Rowshan Policy at 50.[70] Additionally, the Policies include an applicable Virus exclusion. Pacific Endodontics Policy at 60; Cascadia Policy at 58; Rowshan Policy at 62.

The Court will grant Liberty Mutual's Motion and dismiss all claims against it.

### H. Defendant Dentists Insurance Company (20-cv-00661)

#### 1. Case Background

Mark Germack DDS is the only plaintiff to file a claim against the Dentists Insurance Company. See Germack v. Dentists Ins. Co., 20-cv-00661. Germack's Complaint includes no Extra-Contractual Claims. See generally id., Compl.–Class Action, Dkt. No. 1.

In response, Dentists filed two motions currently pending before the Court. The first is a Motion to Dismiss Germack's class action allegations for failure to meet the requirements of FRCP 23. Id., Mot. to Strike and Dismiss All Class Action Allegations in Pl.'s Compl., Dkt. No. 11. The second is a Motion for Summary Judgment, which seeks dismissal of Germack's claims in totem based on the familiar grounds of lack of physical loss or damage, lack of independent grounds for coverage in a Civil Authority provision, and presence of a Virus exclusion. Id., Def.'s Mot. for Summ. J., Dkt. No. 35.

#### 2. Disposition

Germack's Policy does not provide coverage for all of the reasons already stated above. See Germack, Decl. of Jeremy Fullenwider, Ex. B, No. 20-cv-0061, Dkt. No. 36-2 ("Germack Policy"). Its terms for Business Income coverage require "direct physical loss of or damage to property at the described premises." Id. at 12. Similarly, the Policy's Civil Authority provision applies only where "an action of Civil Authority...prohibits access to the described premises because of direct physical loss of or damage to property, other than at the described premises." Id. at 14. Finally, the Policy includes an applicable Virus or Bacteria exclusion. Id. at 31.

**\*36** As such, the Court will grant Dentists' Mot for Summary Judgment and deny its Motion to Dismiss as moot.

### I. Defendant The Travelers Companies, Inc. (20-cv-00597)

#### 1. Case Background

Prior to consolidation, six cases sought to recover against three Travelers subsidiaries.[71] These matters were consolidated under the Nguyen case. Nguyen, Corrected Stipulated Mot. and Order, No. 20-cv-00597, Dkt. No. 33.

After consolidation, all of the Travelers Plaintiffs filed a joint Complaint, which includes no Extra-Contractual Claims. Id., Consolidated Am. Class Action Compl., Dkt. No. 35 ("Consolidated Travelers Compl."). Travelers filed a single Motion to Dismiss this Complaint. Id., Defs.' Revised Mot. to Dismiss the Consolidated Am. Class Action Compl., Dkt. No. 53. This Motion included the familiar grounds of lack of direct physical loss or damage, lack of independent Civil Authority coverage, and an applicable Virus exclusion. Id. at 7–17.

#### 2. Disposition

Reviewing the Travelers Plaintiffs' policies,[72] the Policies contain the familiar requirement for "direct physical loss of or damage to" covered property. Nguyen Policy at 165–66. The Policies' Civil Authority extension is also contingent on direct physical loss or damage. Id. at 178. Finally, the Policies contain an applicable Virus or Bacteria exclusion. Id. at 290.

As such, the Court will grant Travelers' Motion to Dismiss.

### J. Defendant Tri-State Insurance Company of Minnesota (20-cv-01176) 1. Case Background

Only one business, La Cocina de Oaxaca, advances claims against Tri-State Insurance Company. La Cocina de Oaxaca LLC v. Tri-State Ins. Co. of Minn., 20-cv-01176. La Cocina's Complaint does not include any Extra-Contractual Claims. See id., Compl.–Class

Action, Dkt. No. 1. Tri-State moved to dismiss this Complaint on January 15, 2021, id., Def. Tri-State Ins. Co. of Minn.'s Motion to Dismiss the Compl., Dkt. No. 45 ("Tri-State's Mot. to Dismiss"), and La Cocina participated in the Omnibus Response, id., Pls.' Omnibus Opp'n to Defs.' Mots. to Dismiss, Dkt. No. 52.

Tri-State's Motion includes all the familiar arguments of lack of direct physical loss and lack of coverage under a Civil Authority provision. Tri-State's Mot. to Dismiss at 7–16.

#### 2. Disposition

La Cocina's Policy utilizes the familiar "direct physical loss of or damage to" covered property to trigger coverage. Tri-State's Mot. to Dismiss, Ex. A at 96. The Policy's Civil Authority provision also requires physical loss or damage. Id. at 114 ("When a Covered Cause of Loss causes damage to property other than property at the described premises..."); id. ("The action of civil authority is taken in response to dangerous physical conditions of the Covered Cause of Loss that caused damage..."); id. at 132 ("Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy.").

**\*37** For all the reasons previously stated, the Court finds that La Cocina's Policy fails to provide coverage. The Court, therefore, will grant Tri-State's Motion to Dismiss.

VI. CONCLUSION Based on the foregoing, the Court ORDERS as follows:

A. ASPEN LODGING GROUP LLC V. AFFILIATED FM INSURANCE COMPANY, No. 20-cv-01038:

1. Vancouver Clinic's Motion for Partial Summary Judgment, Dkt. No. 33, is DENIED

2. Vancouver Clinic's Request for Judicial Notice, Dkt. No. 35, is DENIED as MOOT.

3. Affiliated FM's Cross-Motion for Partial Summary Judgment against Vancouver Clinic, Dkt. No. 36, is GRANTED.

4. Affiliated FM's Cross-Motion for Partial Summary Judgment against Aspen Lodging, Dkt. No. 39, is GRANTED.

5. Aspen Lodging's Motion for Partial Summary Judgement, Dkt. No. 42, is DENIED.

6. Aspen Lodging's Motion for Judicial Notice, Dkt. No. 44, is DENIED as MOOT.

7. This matter is DISMISSED with Prejudice.

B. MARLER V. ASPEN AMERICAN INSURANCE COMPANY, No. 20-cv-00616:

1. Aspen American's Motion to Dismiss Consolidated Class Action Complaint and Tabaraie Complaint, Dkt. No. 51, is GRANTED.

2. This matter is DISMISSED with Prejudice.

C. MCCULLOCH V. VALLEY FORGE INSURANCE COMPANY, No. 20-cv-00809:

1. CNA's Motion to Dismiss Complaints, Dkt. No. 50, is GRANTED.

2. This matter is DISMISSED with Prejudice.

D. VITA COFFEE LLC V. FIREMAN'S FUND INSURANCE COMPANY, No. 20-cv-01079:

1. Fireman's Fund's Motion to Dismiss, Dkt. No. 10, is GRANTED. 2. United Policyholders, National Independent Venue Association, and Washington Hospitality Association's Motion for Leave to Appear as Amici Curiae in Support of Vita Coffee's Opposition to Defendant's Motion to Dismiss, Dkt. No. 18, is DENIED as MOOT.

3. Fireman's Fund's Consolidated Motion to Dismiss the Complaints of Worthy Hotels, Inc. and Naccarato Restaurant Group, Inc., Dkt. No. 41, is GRANTED.

4. Fireman's Fund's Motion to Dismiss Weimac LLC's Complaint, Dkt. No. 51, is GRANTED.

5. This matter is DISMISSED with Prejudice.

E. CABALLERO V. MASSACHUSETTS BAY INSURANCE COMPANY, No. 20-cv-05437:

1. Massachusetts Bay's 📙 Rule 12 Motions against Plaintiff's First Amended Complaint, Dkt. No. 56, is GRANTED.

2. This matter is DISMISSED with Prejudice.

F. CHORAK V. HARTFORD CASUALTY INSURANCE COMPANY, No. 20-cv-00627:

1. Hartford's Motion to Dismiss and Motion for Judgment on the Pleadings, Dkt. No. 56, is GRANTED.

2. This matter is DISMISSED with Prejudice.

G. PACIFIC ENDODONTICS PS V. OHIO CASUALTY INSURANCE COMPANY, No. 20-cv-00620:

1. Liberty Mutual's Motion for Judgment on the Pleadings, Dkt. No. 46, is GRANTED.

2. This matter is DISMISSED with Prejudice.

H. GERMACK V. DENTISTS INSURANCE COMPANY, No. 20-cv-00661:

1. Dentists' Motion to Strike and Dismiss all Class Action Allegations in Plaintiff's Complaint, Dkt. No. 11, is DENIED as MOOT.

2. Dentists' Motion for Summary Judgment, Dkt. No. 35, is GRANTED.

3. This matter is DISMISSED with Prejudice.

I. NGUYEN V. TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA, No. 20-cv-00597:

1. Travelers' Revised Motion to Dismiss the Consolidated Amended Class Action Complaint, Dkt. No. 53, is GRANTED.

2. This matter is DISMISSED with Prejudice.

J. LA COCINA DE OAXACA LLC V. TRI-STATE INSURANCE COMPANY OF MINNESOTA, No. 20-cv-01176:

 **\*38** 1. Tri-State's Motion to Dismiss the Complaint, Dkt. No. 45, is GRANTED.

2. This matter is DISMISSED with Prejudice. DATED this 28th day of May, 2021.

BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT JUDGE

**All Citations**

Slip Copy, 2021 WL 2184878

Footnotes

1   Many of the Parties have requested oral argument. The Court determines that oral argument is unnecessary to resolve the motions and will, therefore, deny the requests. See Local Rules W.D. Wash. LCR 7(b)(4) ("Unless otherwise ordered by the court, all motions will be decided by the court without oral argument.").

2   The Court may "take judicial notice of the undisputed and publicly available information displayed on government websites." King v. County of Los Angeles, 885 F.3d 548, 555 (9th Cir. 2018).

3   As the policies at issue in this case use inconsistent numbering conventions, the Court will consistently refer to the page number derived from the file uploaded to the Court's Case Management/Electronic Case Files system.

4   As of the date of this Order, of the 292 total orders issued in federal court, 237 have granted full dismissal with prejudice, 30 full dismissal without prejudice, 22 have denied motions to dismiss, and 3 have granted partial dismissal with prejudice.

5   It is worth briefly noting that the undersigned continues to receive similar cases after ordering consolidation of actions. Some of these cases named an insurance group involved in the consolidated cases named above and, as such, the Court ordered consolidation and consideration with the already existing consolidated case. See, e.g., 13 Coins Management LLC v. Nat'l Surety Corp., Min. Order, No. 21-cv-00178, Dkt. No. 8. Other cases named completely new insurance groups. See, e.g., Wellington Athletic Club LLC v. Allied World Surplus Lines Ins. Co., No. 21-cv-00256. Several of the newest cases have filed their own Motions to Dismiss, which the Court will rule on separately in accordance with the principles established herein. See, e.g., HT-Seattle Owner LLC v. Am. Guar. and Liab. Ins. Co., 21-cv-00048; Cadeceus LLC v. Scottsdale Ins. Co., No. 21-cv-00050; B and F Enter. Nw. LLC v. AMCO Ins. Co., 21-cv-00272; First and Stewart Hotel Owner LLC v. Fireman's Fund Ins. Co., 21-cv-00344.

6   The Omnibus Response was filed in the following cases: Marler, No. 20-cv-00616, Dkt. No. 58; McCulloch, No. 20-cv-00809, Dkt. No. 56; Chorak, No. 20-cv-00627, Dkt. No. 64; Pacific Endodontics, No. 20-cv-00620, Dkt. No. 53; Caballero, No. 20-cv-05437, Dkt. No. 63; Nguyen, No. 20-cv-00597, Dkt. No. 58; La Cocina de Oaxaca, No. 20-cv-01176, Dkt. No. 52.

7   The Omnibus Reply was filed in the following cases: Marler, No. 20-cv-00616, Dkt. No. 67; McCulloch, No. 20- cv-00809, Dkt. No. 65; Chorak, No. 20-cv-00627, Dkt. No. 73; Pacific Endodontics, No. 20-cv-00620, Dkt. No. 64; Caballero, No. 20-cv-05437, Dkt. No. 72; Nguyen, No. 20-cv-00597, Dkt. No. 67; La Cocina de Oaxaca, No. 20- cv-01176, Dkt. No. 61.

8   Several of the consolidated cases, as well as some of the non-consolidated cases, also filed a Motion to Certify Questions to the Washington State Supreme Court. See, e.g., Chorak, Pls.' Mot. to Certify Questions to the Wash. Supreme Ct., No. 20-cv-00627, Dkt. No. 66. On April 23, 2021, this Court issued an order denying that Motion. See id., Order Den. Mot. to Certify Questions to the Wash. Supreme Court, Dkt. No. 85.

9   Some Defendants filed more than one dispositive motion if the plaintiffs in their consolidated matter filed separate complaints.

10  The Court permitted limited discovery in one case to address a choice of law issue. See Aspen Lodging, Min. Entry, No. 20-cv-01038, Dkt. No. 27.

11  To the extent that Plaintiffs rely on American Best Food, Inc. v. Alea London, Ltd., 229 P.3d 693 (Wash. 2010), to argue that the Washington Supreme Court has established a rule of interpretation requiring courts evaluating Washington law to find ambiguity in an insurance contract where there is conflicting out-of-state precedent on an undecided question within the State, the Court is unconvinced. See Omnibus Resp. at 10, 16–20. In that case, the Washington Supreme Court announced no rules or presumptions and did no more than look to out-of-state precedents when no in-state precedent applied to the specific question it sought to answer. See Am. Best Food, 229 P.3d at 697–99. This Court will do the same.

12  See, e.g., Circus Circus LV, LP v. AIG Specialty Ins. Co., No. 20-cv-01240, 2021 WL 769660, at *4 (D. Nev. Feb. 26, 2021); Santo's Italian Cafe LLC v. Acuity Ins. Co., No. 20-cv-01192, 2020 WL 7490095, at *7 (N.D. Ohio Dec. 21, 2020); Hajer v. Ohio Sec. Ins. Co., No. 20-cv-00283, 2020 WL 7211636, at *2 (E.D. Tex. Dec. 7, 2020).

13  Gerleman Mgmt., Inc. v. Atl. States Ins. Co., No. 20-cv-183, 2020 WL 8093577, at *5 (S.D. Iowa Dec. 11, 2020).

14  MIKMAR, Inc. v. Westfield Ins. Co., No. 20-cv-01313, 2021 WL 615304, at *5 (N.D. Ohio Feb. 17, 2021).

15  PSG-Mid Cities Med. Ctr., LLC v. Jarrell, No. 20-cv-02477, 2021 WL 1894696, at *3 (N.D. Tex. May 11, 2021) (quoting Hartford Ins. Co. of Midwest v. Miss. Valley Gas Co., 181 F. App'x 465, 469–70 (5th Cir. 2006)).

16  1 S.A.N.T., Inc. v. Berkshire Hathaway, Inc., No. 20-cv-862, 2021 WL 147139, at *6 (W.D. Pa. Jan. 15, 2021).

17  See, e.g., SAS Int'l, Ltd. v. Gen. Star Indem. Co., No. 20-cv-11864, 2021 WL 664043, at *3 (D. Mass. Feb. 19, 2021); SA Palm Beach LLC v. Certain Underwriters at Lloyd's, London, No. 20-cv-80677, 2020 WL 7251643, at *4 (S.D. Fla. Dec. 9, 2020); Hillcrest Optical, Inc. v. Cont'l Cas. Co., 497 F. Supp. 3d 1203, 1211 (S.D. Ala. 2020).

18  See, e.g., Bachman's Inc. v. Florists' Mut. Ins. Co., No. 20-cv-2399, 2021 WL 981246, at *4 (D. Minn. Mar. 16, 2021); Legal Sea Foods, LLC v. Strathmore Ins. Co., No. 20-cv-10850, 2021 WL 858378, at *2, *3–*4 (D. Mass. Mar. 5, 2021) (granting dismissal despite plaintiff pleading actual presence); Terry Black's Barbecue, LLC v. State Auto. Mut. Ins. Co., No. 20-cv-665, 2021 WL 972878, at *8–*9 (W.D. Tex. Jan. 21, 2021); Promotional Headwear Int'l v. Cincinnati Ins. Co., No. 20-cv-2211, 2020 WL 7078735, at *8 (D. Kan. Dec. 3, 2020); Uncork & Create, 498 F. Supp. 3d at 883–84.

19  Defendants also refer to several unpublished opinions of the Washington State Court of Appeals. See Herr v. Forghani, No. 64738–5–I, 2011 WL 1833829 (Wash. Ct. App. May 16, 2011); Wash. Mut. Bank v. Commonwealth Ins. Co., No. 56396–3–I, 2006 WL 1731318 (Wash. Ct. App. June 26, 2006); Borton & Sons, Inc. v. Travelers Insurance Co., No. 18100–6–III, 2000 WL 60028 (Wash. Ct. App. Jan. 25, 2000). These unpublished opinions by that court "have no precedential value and are not binding upon any court." Wash. R. Gen. Application 14.1 (citation of unpublished opinions); see also Oltman v. Holland Am. Line USA, Inc., 178 P.3d 981, 988 n.9 (Wash. 2008).

20  a. Business Income
(2) We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at the described premises.
b. Extra Expense
(1) Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.
c. Extended Business Income
(1) If the necessary "suspension" of your "operations" produces a Business Income loss payable under paragraph a. above, we will also pay...
However, this extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of a Covered Cause of Loss in the area where the described premises are located.

21  G. Civil Authority
(1) When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations,

other than described premises, that are within 100 miles of the described premises, caused by or resulting from a Covered Cause of Loss.

22    Proximate cause arguments indistinguishable from Plaintiffs' arguments have been rejected by nearly every court. See, e.g., Carpe Diem Spa, Inc. v. Travelers Cas. Ins. Co. of Am., No. 20-cv-14860, 2021 WL 1153171, at *3 (D.N.J. Mar. 26, 2021); Downs Ford, Inc. v. Zurich Am. Ins. Co., No. 20-cv-08595, 2021 WL 1138141, at *5 (D.N.J. Mar. 25, 2021); Westside Head & Neck v. Hartford Fin. Servs. Grp., Inc., No. 20-cv-06132, 2021 WL 1060032, at *5 (C.D. Cal. Mar. 19, 2021).

23    See Aspen Lodging, Decl. of Jerry H. Stein, Ex. A, No. 20-cv-01038, Dkt. No. 34-1 ("Vancouver Clinic Policy"); id., Decl. of Richard Sunny, Ex. D., Dkt. No. 41-4 ("Aspen Lodging Policy").

24    See Vancouver Clinic Policy at 10; see also Aspen Lodging Policy at 35, stating
E. INSURANCE PROVIDED:
This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded

25    See Vancouver Clinic Policy at 45; see also Aspen Lodging Policy at 59, stating
3. Communicable Disease – Business Interruption
If a described location owned, leased or rented by the Insured has the actual not suspected presence of communicable disease and access to such described location is limited, restricted or prohibited by:
a) An order of an authorized governmental agency regulating such presence of communicable disease; or
b) A decision of an Officer of the Insured as a result of such presence of communicable disease, This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of
Liability at such described location with such presence of communicable disease.

26    See Vancouver Clinic Policy at 27; see also Aspen Lodging Policy at 41, stating
5. Communicable Disease – Property Damage
If a described location owned, leased or rented by the Insured has the actual not suspected presence of communicable disease and access to such described location is limited, restricted or prohibited by:
a) An order of an authorized governmental agency regulating or as result of such presence of communicable disease; or
b) A decision of an Officer of the Insured as a result of such presence of communicable disease,
This Policy covers the reasonable and necessary costs incurred by the Insured at such described location for the:
a) Cleanup, removal and disposal of such presence of communicable disease from insured property; and
b) Actual costs or fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from such presence of communicable disease on insured property.

27    See Vancouver Clinic Policy at 11, 12; see also Aspen Lodging Policy at 22 ($500,000 cap), 23, stating
Additional Coverages
$100,000 Communicable Disease - Property Damage annual aggregate Business Interruption Coverage Extensions
$100,000 Communicable Disease - Business Interruption annual aggregate for a 12 Month Period of Liability

28    See Vancouver Clinic Policy at 44–45; see also Aspen Lodging Policy at 58–59, stating
2. Civil or Military Authority
This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a location provided such order is the direct result of physical damage of the type insured at a location or within five (5) statute miles of it.

29    See Vancouver Clinic Policy at 82; see also Aspen Lodging Policy at 100, stating
This policy excludes loss or damage caused by any of the following excluded events...10. Contamination, and any cost due to contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy; nor will the foregoing constitute direct physical loss or damage insured by this policy.
"Contamination" is defined as
any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.
Vancouver Clinic Policy at 62; see also Aspen Lodging Policy at 76

30 See Aspen Lodging, Vancouver Clinic's Mot. for Partial Summ. J., No. 20-cv-01038, Dkt. No. 33 ("Vancouver Clinic's Mot."); id., Affiliated FM Cross-Mot. For Partial Summ. J. against Vancouver Clinic, Dkt. No. 36 ("Affiliated FM's Vancouver Clinic Mot."); id., Affiliated FM's Cross-Mot. for Partial Summ. J. against Aspen Lodging, Dkt. No. 39 ("Affiliated FM's Aspen Lodging Mot."); id., Aspen Lodging's Mot. For Partial Summ. J., Dkt. No. 42 ("Aspen Lodging's Mot.").

31 See Aspen Lodging, Vancouver Clinic's Request for Judicial Notice, No. 20-cv-01038, Dkt. No. 35; id., Aspen's Mot. for Judicial Notice, Dkt. No. 44.

32 Additionally, the Parties debate the applicability of the Contamination exclusion. Affiliated FM argues that, even were coverage established under the Insurance Provided provision, coverage pursuant to a virus such as COVID-19 would be barred by the Contamination exclusion. See Affiliated FM's Vancouver Clinic Mot. at 17–19. Vancouver Clinic argues that the Contamination exclusion does not apply, and that Affiliated FM seeks to apply it inconsistently to bar coverage under the Insurance Provided provision but not the Communicable Disease provisions. See Vancouver Clinic's Mot. at 26–29. The Contamination exclusion operates similarly to the Virus exclusion discussed supra and applies equally. See supra at 28– 31. Further, it is not applied inconsistently. The structure of the Policies leads to the conclusion that the Communicable Disease provisions are meant as an exception to the Policy's exclusions. In other words, as to both the Property Insured and Business Interruption extensions, the pattern is (1) losses insured through the Insurance Provided provision, including a physical loss or damage trigger; (2) exclusions, including the Contamination exclusion; and (3) extensions, including the Communicable Disease provisions. Thus, by the construction of the contract, the exclusions apply (including the Contamination exclusion) to the losses insured, except where modified by the subsequent extensions (including the Communicable Disease provisions). In terms of the circumstances at hand, this construction means that (1) COVID-19 does not trigger coverage because of a lack of physical loss or damage; (2) even if it did, the Contamination exclusion would exclude coverage; (3) but, since the terms of the Communicable Disease provisions are met, coverage is available under these provisions alone.

33 Available at http://lawfilesext.leg.wa.gov/biennium/2021- 22/Pdf/Bills/Senate%20Bills/5351.pdf? q=20210408122846

34 Available at http://lawfilesext.leg.wa.gov/biennium/2021- 22/Pdf/Bills/Senate%20Bills/5351.pdf? q=20210408122846

35 See Marler v. Aspen Am. Ins. Co., No. 20-cv-00616; Karla Aylen DDS PLLC v. Aspen Am. Ins. Co., No. 20-cv- 00717; Shokofeh Tabaraie DDS PLLC v. Aspen Am. Ins. Co., No. 20-cv-01035; Jagow v. Aspen Am. Ins. Co., No. 20-cv-01205; Mikkelson v. Aspen Am. Ins. Co., No. 20-cv-05378

36 See Marler Policy at 10 (Practice Income provision: "The suspension must be caused by direct physical damage to the building or blanket dental practice personal property at the described premises caused by or resulting from a covered cause of loss..."); 11 (Extra Expense provision: "Extra expense means the extra expenses necessarily incurred by you during the period of restoration to continue normal services and operations which are interrupted due to damage by a covered cause of loss to the premises described..."), 11 (Extended Practice Income provision: "Loss of practice income must be caused by direct physical damage at the described premises caused by or resulting from any covered cause of loss.").

37 Prior to consolidation, the constituent cases included Kara McCulloch DMD MSD PLLC v. Valley Forge Ins. Co., No. 20-cv-00809; Noskenda Inc v. Valley Forge Ins. Co., No. 20-cv-00854; Jae Y. Hong DDS PS v. Valley Forge Ins. Co., No. 20-cv-00891; Jae Y Hong PLLC v. Transportation Ins. Co., No 20-cv-05556; and Owens Davies PS v. National Fire Ins. Co. of Hartford, No. 20-cv-06155.

38 Stating
We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

39 Stating
Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

40 Stating

If the necessary "suspension" of your "operations" produces a Business Income loss payable under Paragraph 1. Business Income above, we will also pay for the actual loss of Business Income you sustain during the period that:...

this extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of loss in the area where the described premises are located.

41 Stating

When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, caused by or resulting from a Covered Cause of Loss.

42 See Vita Coffee LLC v. Fireman's Fund Ins. Co., 20-cv-01079; ES Rest. Group Inc. v Fireman's Fund Ins. Co., 20-cv-01193; Worthy Hotels Inc. v. Fireman's Fund Ins. Co., 20-cv-01515; Naccarato Rest. Group Inc. v. Fireman's Fund Ins. Co., 20-cv-06108.

43 See Vita Coffee, Compl., No. 20-cv-01079, Dkt. No. 1-1 ("Vita Coffee Compl."); ES Rest. Group, Compl., No. 20-cv-01193, Dkt. No. 1-1 ("ES Compl."); Worthy Hotels, Compl., No. 20-cv-01515, Dkt. No. 1 ("Worthy Compl."); Naccarato Rest. Group, Compl., No. 20-cv-06108, Dkt. No. 1 ("Naccarato Compl."); Weimac LLC, Compl., No. 21-cv-0025, Dkt. No. 1 ("Weimac Compl.").

44 See Vita Coffee Compl. ¶¶ 4.1–4.4, 4.9–4.16 (IFCA and WCPA); ES Compl. ¶¶ 63–72, 75–81 (Bad Faith, WCPA, IFCA); Worthy Compl. ¶¶ 75–91, 97–101 (IFCA, Bad Faith, Negligence, CPA); Naccarato Compl. ¶¶ 47– 56 (Bad Faith, WCPA); Weimac Compl. ¶¶ 70–85 (IFCA, WCPA, Bad Faith).

45 See Vita Coffee, Mots. to Dismiss, No. 20-cv-01079, Dkt. Nos. 10 ("Vita Coffee Mot. to Dismiss"); 41 ("Worthy/Naccarato Mot. to Dismiss"); 51 ("Weimac Mot. to Dismiss").

46 Additionally, three groups submitted a Motion to appear as Amicus on behalf of Plaintiffs. Vita Coffee, United Policyholders, Nat'l Indep. Venue Ass'n, and Wash. Hosp. Ass'n's Mot. for Leave to Appear as Amici Curiae in Support of Vita Coffee's Opp'n to Def.'s Mot. to Dismiss., No. 20-cv-01079, Dkt. No. 18. Fireman's Fund opposed leave. Id., Def.'s Opp'n to Motion for Leave to Appear as Amici Curiae, Dkt. No. 23. As the Court resolves the Motions without reference to Amici's proposed brief, the Motion for Leave is denied as moot.

47 See Canlis, Stipulation and Joint Mot. to Consolidate Under LCR 42, No. 21-cv-00373, Dkt. No. 9; 13 Coins Mgmt., Stipulation and Joint Mot. to Consolidate Under LCR 42, No. 21-cv-00178, Dkt. No. 6; see also Vita Coffee, Order Granting Parties' Stipulated Mot., No. 20-cv-01079, Dkt. No. 64.

48 See Vita Coffee Mot. to Dismiss at 11–24; ES Mot. to Dismiss at 9–21; Worthy/Naccarato Mot. to Dismiss at 11– 21, 23–24; Weimac Mot. to Dismiss at 7–16.

49 ES Mot. at 21–24; Worthy/Naccarato Mot. to Dismiss at 21–22.

50 See Vita Coffee, Pl. Vita Coffee, LLC's Opp'n to Def. Fireman's Fund Ins. Co.'s Mot. to Dismiss. No. 20-cv-1079, Dkt. No. 21 at 18–22; id., Pl. Worthy Hotels, Inc. et al., and Naccarato Rest. Group Inc.'s Consolidated Resp. to Def.'s Mot. to Dismiss, Dkt. No. 46 at 17.

51 See Vita Coffee, Decl. of Anthony Todaro, Ex. A, No. 20-cv-01079, Dkt. No. 11-1 ("Vita Coffee Policy"); id. Decl. of Anthony Todaro, Ex. A, Dkt. No. 42-1 ("Worthy Policy"); id. Decl. of Anthony Todaro, Ex. B, Dkt. No. 42-2 ("Naccarato Policy"); id., Decl. of Anthony Todaro, Ex. A, Dkt. No. 52-1 ("Weimac Policy"); ES Restaurant Group, Decl. of Anthony Todaro, Ex. A, No. 20-cv-01193, Dkt. No. 5-1 ("ES Policy").

52 See also Worthy Policy at 31; Naccarato Policy at 38; Weimac Policy at 41; ES Policy at 48.

53 See also Worthy Policy at 45; Naccarato Policy at 61; Weimac Policy at 53; ES Policy at 71.

54 In these two ways, Vita Coffee and Worthy's claims differ from those of Vancouver Clinic, whose Communicable Disease provisions provided coverage. See supra at 35, 37. Vancouver Clinic's provisions did not require physical loss or damage, where Vita Coffee and Worthy's policies do. Additionally, while Vancouver Clinic plead actual presence, Vita Coffee and Worthy did not.

55 Stating

We will pay for the actual loss of Business income you sustain and necessary Extra Expense you incur when ingress to or egress from the described premises is prevented, due to direct physical loss of or damage to property that is away from but within 2000 feet of the described premises, caused by or resulting from any Covered Cause of Loss covered under this policy.

56  See Chorak v. Hartford Cas. Ins. Co., 20-cv-00627; Kim v. Sentinel Ins. Co. Ltd., 20-cv-00657; Glow Medispa LLC v. Sentinel Ins. Co. Ltd., 20-cv-00712; Strelow v. Hartford Cas. Ins. Co., 20-cv-00797; KCJ Studios LLC al v. Sentinel Ins. Co. Ltd., 20-cv-01207; Seattle Symphony Orchestra v. Hartford Fire Ins. Co., 20-cv-01252; SCRBKR2017 LLC v. Sentinel Ins. Co. Ltd., 20-cv-01537; Seattle Bakery LLC v. Sentinel Ins. Co. Ltd., 20-cv- 01540; Piroshky Piroshky Bakery LLC v. Sentinel Ins. Co. Ltd., 20-cv-01541; Prato v. Sentinel Ins. Co. Ltd., 20-cv- 05402; Lee v. Sentinel Ins. Co. Ltd., 20-cv-05422; and J Bells LLC v. Sentinel Ins. Co. Ltd., 20-cv-05820.

57  See Strelow Compl. ¶¶ 112–139 (Bad Faith, WCPA, IFCA); Seattle Symphony Compl. ¶¶ 61–71 (Bad Faith, WCPA, IFCA, Negligence); J Bells Compl. ¶¶ 39–50 (WCPA, Bad Faith); SCRBKR Compl. ¶¶ 4.1–7.7 (Bad Faith WCPA, IFCA); Seattle Bakery Compl. ¶¶ 4.1–7.7 (Bad Faith, WCPA, IFCA); Piroshky Piroshky Compl. ¶¶ 4.1–7.7 (Bad Faith, WCPA, IFCA)

58  The "Piroshky Plaintiffs" consist of SCRBKR 2017, LLC; Seattle Bakery LLC and CSQBKR2018, LLC; and Piroshky Piroshky Bakery LLC and Piroshky Baking Company, LLC. Omnibus Resp. at iv. While these Plaintiffs filed separate actions and submitted separate Complaints, they run similar businesses selling piroshky and other baked goods at locations such as the South Center Mall, Columbia Center food court, and Pike Place Market. See SCRBKR Compl. ¶¶ 2.1; Seattle Bakery Compl. ¶¶ 2.1–2.2; Piroshky Piroshky Compl. ¶¶ 2.1–2.2. It is not clear from the face of the Complaints how inter-related these companies and businesses are.

59  Stating
We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or physical damage to property at the "scheduled premises," including personal property in the open (or in a vehicle) within 1,000 feet of the "scheduled premises", caused by or resulting from a Covered Cause of Loss.

60  Stating
We will pay up to the Special Business Income Limit of Insurance stated in the Property Choice – Schedule of Premises and Coverages for the actual loss of Business Income you sustain and the actual, necessary and reasonable Extra Expense you incur due to the necessary interruption of your business operations during the Period of Restoration due to physical loss of or direct physical damage to property caused by or resulting from a Covered Cause of loss at "scheduled Premises"....

61  Stating
3. Covered Cause of Loss
RISKS OF DIRECT PHYSICAL LOSS...

62  Stating
q. Civil Authority
(1) This insurance is extended to apply to the actual loss of Business Income you sustain when access to your "scheduled premises" is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate are of your "scheduled premises."

63  Stating the same as the Chorak Policy but defining Covered Cause of Loss as
Covered Causes of Loss means direct physical loss or direct physical damage that occurs during the Policy Period and in the Coverage Territory unless the loss or damage is excluded or limited in this policy.

64  Specifically, the Endorsement appears as follows:
"FUNGUS", WET ROT, DRY ROT, BACTERIA AND VIRUS – REMOVAL OF LIMITATIONS – WASHINGTON
This endorsement modifies insurance provided under the following:
PROPERTY CHOICE COVERAGE PART
The Following applies to insured risks situated in Washington:
...
B. Applicable to the PROPERTY CHOICE – COVERED CAUSES OF LOSS AND EXCLUSIONS FORM:
Specific Exclusion – "Fungus", Wet Rote, Dry Rot, Bacteria or Virus is deleted.

65  The relevant provisions in each of the Piroshky Plaintiffs' policies do not differ. As such, the Court will refer only to the Policy of Piroshky Piroshky Bakery, LLC. See Chorak, Hartford's Mot. to Dismiss, Ex. I, Dkt. No. 56-9 ("Piroshky Policy").

66  See Strelow Compl. ¶¶ 113–16, 120, 122–23, 135; Seattle Symphony Compl. ¶¶ 62, 64, 66–67, 70; J Bells Compl. ¶¶ 40–41; 45–48; SCRBKR Compl. ¶¶ 4.3, 4.5–4.7, 5.3–5.6, 6.3, 6.5, 7.2; Seattle Bakery Compl. ¶¶ 4.3, 4.5–4.7, 5.3–5.11, 6.3, 6.5, 7.2; Piroshky Piroshky Compl. ¶¶ 4.3, 4.5–4.7, 5.3–5.6, 6.3, 6.5, 7.2.

67  See Pacific Endodontics PS v. Ohio Cas. Ins. Co., No. 20-cv-00629; Hirbod H Rowshan DDS PS v. Ohio Sec. Ins. Co., No. 20-cv-00730; Cascadia Dental Specialists Inc. v. Am. Fire and Cas. Co., No. 20-cv-00732.

68  See Pacific Endodontics, Am. Compl., No. 20-cv-00629, Dkt. No. 5; Rowshan, Compl., No. 20-cv-00730, Dkt. No. 1; Cascadia Dental Specialists, Compl., No. 20-cv-00732, Dkt. No. 1.

69  See Liberty Mutual' s Mot., Ex. A, Dkt. No. 46-1 ("Pacific Endodontics Policy"); id., Ex. B, Dkt. No. 46-2 ("Cascadia Policy"); id., Ex. C, Dkt. No. 46-3 ("Rowshan Policy").

70  Specifically, the Civil Authority extension states that "[w]hen a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises." Pacific Endodontics Policy at 48. "Covered Cause of Loss" is defined as "[d]irect physical loss unless the loss is excluded or limited." Id. at 40. Thus, Civil Authority incorporates the requirements of loss and damage.

71  See Nguyen v. Travelers Cas. Ins. Co. of Am., No. 20-cv-00597; Fox v. Travelers Cas. Ins. Co. of Am., No. 20-cv- 00598; Hsue v Travelers Cas. Ins. Co. of Am., 20-cv-00622; Kashner v. Travelers Indem. Co. of Am., No. 20-cv- 00625; Stan's Bar-B-Q LLC v. The Charter Oak Fire Ins. Co., 20-cv-00613; Bath v. Travelers Cas. Ins. Co. of Am., No. 20-cv-05489.

72  All of the policies are identical in their relevant aspects. See Consolidated Travelers Compl. ¶ 27. As such, the Court will exclusively refer to the policy of Jennifer B Nguyen DDS PLLC. Nguyen, Defs.' Mot. to Dismiss the Consolidated Am. Class Action Compl., Ex. A, No. 20-cv-00597, Dkt. No. 44-1 ("Nguyen Policy").

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.